# Exhibit 1

RCH: AXB/SKW
F. #2024R00298

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FCARONE@ABRAMSLAW.COM THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC. | **TO BE FILED UNDER SEAL**<br><br>**APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF APPLE, INC.**<br><br>Case No. 24-mj-640 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Anthony Cunder, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the above-listed Apple ID (the "**Target Account**") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2. I am a Special Agent with the Office of the United States Attorney for the Eastern District of New York ("USAO-EDNY") and have been since 2022. As such, I am a "federal law enforcement officer" for purposes of Rule 41. I am currently assigned to the USAO-EDNY's Public Integrity Section, which is focused on investigating and prosecuting white collar crimes, including, but not limited to, economic crimes such as mail, wire, and bank fraud, healthcare fraud

and money laundering, and public corruption-related offenses such as bribery, government program fraud and honest services fraud. I have both led and supported numerous investigations, during which I have employed various investigative techniques, including, but not limited to, surveillance, de-briefing witnesses, executing search warrants and reviewing electronic evidence maintained by Internet service providers, such as Apple. This affidavit is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement officers and my training and experience concerning the investigation of white-collar crimes.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence, contraband, instrumentalities, and fruits of violations of, *inter alia*, Title 18, United States Code, Sections 201 (bribery); 371 (conspiracy); 666 (government program fraud); 1001 (false statements); 1343 (wire fraud); 1344 (bank fraud); 1346 (honest services fraud); 1349 (wire/bank fraud conspiracy); 1956 (money laundering); and 1957 (unlawful monetary transactions) (collectively, the "Target Offenses"), as described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

Overview of the Investigation

6. The USAO-EDNY, in conjunction with the Federal Bureau of Investigation, the Internal Revenue Service, and the New York City Department of Investigations, is investigating an apparent "pay to play" scheme involving Frank V. Carone ("F. Carone"), the former Chief of Staff for New York City Mayor Eric Adams. Specifically, among other things, the investigation is focused on the circumstances of approximately $600,000 that was apparently funneled from third parties either doing business with, or seeking to do business with, the City of New York (the "City") to a bank account in F. Carone's brother's name, which was then used for F. Carone's personal benefit, including to discharge his personal credit card debt. As explained more fully below, Your Affiant respectfully submits that that there is probable cause to believe the **Target Account** will contain evidence, fruits, and instrumentalities of this conduct, which constitute one or more Target Offenses.

Relevant Individuals, Entities, and Financial Accounts

7. According to the New York State Department of State, Division of Corporations, since March 8, 2012, F. Carone has maintained a domestic personal service corporation named Carone Law, P.C., with a principal place of business in Brooklyn, New York. During the same period, Carone Law, P.C. has owned a bank account at ConnectOne Bank, which was assigned account number [redacted] (the "Carone Law Account"). F. Carone was the only authorized signer on the Carone Law Account.

8. F. Carone also used multiple American Express cards for his own personal benefit and the benefit of his immediate family members, including: [redacted].[1] Based on my review of the statements associated with the Carone Amex Accounts, I know that the underlying credit card charges were predominantly for personal expenses, including charges for travel, dining, fitness memberships, clothing purchases, groceries, and the like.

9. F. Carone's brother, Anthony J. Carone ("A. Carone") is an attorney who, since January 23, 2004, has maintained a domestic professional service limited liability company named Carone & Associates, PLLC, with a principal place of business in Brooklyn, New York. On or about May 4, 2015, Carone & Associates, PLLC opened a bank account at Flagstar Bank, which was assigned account number [redacted] (the "Carone Assoc. Account"). A. Carone, along with his two law partners, Rudy Migliorisi and Anthony Castellano, were the only authorized signers on the Carone Assoc. Account.

10. Based on my review of financial records associated with the Carone Assoc. Account, that account was essentially dormant from May 4, 2015, when it was created, until

[1] The Business Gold Rewards Card ending in [redacted] was issued to F. Carone but was associated with an American Express account owned by Abrams Fensterman LLP, the law firm of which F. Carone was a partner prior to joining the Adams administration. The other credit card accounts comprising the Carone Amex Accounts were issued to F. Carone, his wife Diana Carone, and their adult children.

January 2022, when F. Carone became Mayor Adams's Chief of Staff. Specifically, those records reflect only three, negligible transactions in the Carone Assoc. Account prior to January 2022: an initial deposit of $2,500 on May 4, 2015, and two transfers totaling $50.01 to the Carone & Associates, PLLC client trust fund (IOLA) account.

The Pay-to-Play Scheme

11. Based on my review of records pertaining to the Carone Law Account, the Carone Assoc. Account, the Carone Amex Accounts, and other records obtained from third party custodians, I submit there is probable cause to believe that, in his capacity as Mayor Adams's Chief of Staff, F. Carone solicited and received bribes and kickbacks from one or more third parties doing business, or seeking to do business, with the City. I further believe there is probable cause to believe that, to conceal the illegal nature of those payments, F. Carone, A. Carone, and others known and unknown, conspired to launder the funds through the Carone Assoc. Account before ultimately being used for F. Carone's personal benefit, including through payments to the Carone Amex Accounts.

12. On or about December 29, 2021, Mayor Adams announced he would appoint F. Carone as his Chief of Staff. *See, e.g.*, Emma Fitzsimmons and Michael Rothfield, *Eric Adams Will Name Brooklyn Power Broker as Chief of Staff*, THE NEW YORK TIMES (Dec. 29, 2021), https://www.nytimes.com/2021/12/29/nyregion/eric-adams-frank-carone-chief-of-staff.html (last visited Oct. 25, 2024).

13. In the months immediately preceding that announcement, between August 20 and December 20, 2021, a company called [redacted] made regular payments to the Carone Law Account—which, as noted above, was owned by F. Carone—totaling

approximately $70,000. Those payments were received on August 20, 2021 ($25,000), October 12, 2021 ($15,000), November 3, 2021 ($15,000), and December 10, 2021 ($15,000).

14. Shortly after F. Carone became Mayor Adams's Chief of Staff, however, [redacted] ceased making payments to the Carone Law Account and began directing those payments to the Carone Assoc. Account—which, as noted above, was nominally owned by A. Carone and had been effectively dormant for the preceding seven years. Specifically, beginning on January 20, 2022, [redacted] sent the following wires, totaling approximately $124,970.00, to the Carone Assoc. Account:

| Date | Amount |
|---|---|
| 1/20/2022 | $14,970.00 |
| 2/23/2022 | $15,000.00 |
| 3/7/2022 | $15,000.00 |
| 4/7/2022 | $10,000.00 |
| 5/11/2022 | $10,000.00 |
| 6/30/2022 | $10,000.00 |
| 7/26/2022 | $10,000.00 |
| 8/22/2022 | $10,000.00 |
| 10/13/2022 | $20,000.0 |
| 12/7/2022 | $10,000.00 |

15. Open-source records maintained by the Office of the City Clerk reflect that in 2022—*i.e.*, when [redacted] began diverting payments to the Carone Assoc. Account—[redacted] also began actively lobbying the City [redacted]

16. During approximately the same period, several other companies also began making payments into the long-dormant Carone Assoc. Account—payments that coincide with efforts to obtain municipal contracts from the City. For example, on January 6, 2022—the same day Mayor Adams was inaugurated—a company called [redacted] wired $20,000 into the Carone Assoc. Account. On March 11, 2022, [redacted] wired another $20,000 into the account.

Open-source procurement records maintained by the City reflect that on or about July 1, 2022, [redacted] granted [redacted] a multiyear contract [redacted]

17. In addition, beginning on January 12, 2022—less than a week after Mayor Adams's inauguration—[redacted] began making regular payments, totaling approximately $82,500, into the Carone Assoc. Account:

| Date | Amount |
|---|---|
| 1/12/2022 | $7,500.00 |
| 2/8/2022 | $7,500.00 |
| 3/1/2022 | $7,500.00 |
| 4/11/2022 | $7,500.00 |
| 5/9/2022 | $7,500.00 |
| 6/17/2022 | $7,500.00 |
| 7/7/2022 | $7,500.00 |
| 8/3/2022 | $7,500.00 |
| 9/8/2022 | $7,500.00 |
| 11/1/2022 | $7,500.00 |
| 11/28/2022 | $7,500.00 |

18. Open-source records maintained by the City Comptroller's Office reflect that in 2022—*i.e.*, when [redacted] began making payments to the Carone Assoc. Account—[redacted] awarded to [redacted] three contracts, [redacted]

19. Furthermore, beginning on October 14, 2022, a company called Sapphire Hotel LLC (and a related entity called 29-12 LIC LLC) began making monthly payments, totaling approximately $120,000.00, into the Carone Assoc. Account:

| Date | Payor | Amount |
|---|---|---|
| 10/14/2022 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |
| 11/10/2022 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |

| | | |
|---|---|---|
| 12/8/2022 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |
| 2/24/2023 | 29-12 LIC LLC | $20,000.00 |
| 3/10/2023 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |
| 4/11/2023 | 29-12 LIC LLC | $20,000.00 |
| 5/8/2023 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |
| 6/16/2023 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |
| 7/20/2023 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |
| 9/21/2023 | Sapphire Hotel LLC DBA Microtel | $10,000.00 |

20. Upon information and belief, Sapphire Hotel LLC is the holding company that owns the Microtel Inn by Wyndham, which is located at 29-12 40th Avenue, Long Island City, New York. The above-referenced payments followed months of telephone communications between Sapphire Hotel LLC's owner, Andy Zhu, and F. Carone. Toll records obtained from Verizon Wireless, which I have reviewed, reflect that between May 28 and October 1, 2022—when F. Carone was serving as Chief of Staff—F. Carone and Zhu exchanged at least 11 telephone calls. Additionally, from approximately June 2, 2023, through March 13, 2024, F. Carone and Zhu exchanged at least 67 telephone calls. F. Carone used a cellphone assigned call number [redacted] (the "F. Carone Phone") to conduct those calls. Those toll records further reflect that between approximately June 24 and November 9, 2022, Zhu exchanged at least 15 telephone calls with A. Carone.

21. As set forth below, these payments also coincided with modifications in the municipal bidding process that, based on my training and experience, appear to favor Sapphire Hotel LLC. Specifically, based on my review of procurement records obtained from the City, I am aware that on or about August 5, 2022, the Department of Homeless Services released an emergency solicitation to 175 service providers on a vendor list to provide transitional migrant shelter services. It was an open-ended solicitation; therefore, proposals would be accepted on an ongoing basis until capacity needs were met. The criteria for the sites were described as follows:

"The selected vendor(s) is expected to find Facilities with a minimum of 150 units. Proposers should provide 100% of the building for DHS use and not have a mix of asylum-seeking clients and other private clients."

22. Thereafter, on or about On October 21, 2022—*i.e.*, one week after the first payment from Sapphire Hotel LLC to the Carone Assoc. Account—the language of the criteria for the sites was amended to state: "The selected vendor(s) should find Facilities of approximately 150 units or more, although DHS will consider Facilities less than 150 units. Proposers should provide 100% of the building for DHS use and not have a mix of asylum-seeking clients and other private clients. However, DHS will also consider sites that have other uses including sections of the hotel for paying guests and parts of the building having permanent tenants."

23. Open-source procurement records maintained by the City reflect that on or about November 1, 2022—about two-and-a-half weeks after the first payment was made by Sapphire Hotel LLC to the Carone Assoc. Account—the Department of Homeless Services awarded Sapphire Hotel LLC a contract, valued at approximately$4,028,198.00, to operate its 75-unit Queens facility as a transitional migrant shelter.[2]

24. The payments outlined above reflect a small sample of the sudden influx of money into the Carone Assoc. Account. Based on my review of the relevant financial records, I know that between January 6 and December 23, 2022, when F. Carone was serving as Chief of Staff, approximately $552,645.51 was paid into the Carone Assocs. Account. Those payments continued after F. Carone resigned as Chief of Staff, with another $916,536.51 being paid into the Carone

[2] Subsequently, in 2023, the contract was extended, increasing its value by approximately $10,346,924.00.

Assoc. Account in 2023 and year-to-date 2024, including $110,000 from [redacted]; $90,000.00 from Sapphire Hotel LLC (and the related entity 29-12 LIC LLC); and $30,000 from [redacted]

25. In addition to the entities profiled above, my review of the financial records pertaining to the Carone Assoc. Account reveal payments from the following entities in the amounts depicted below:

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

26. I also know that, in 2022 alone, when F. Carone was serving as Chief of Staff, approximately $395,974.03 (or about 78% of the total money paid into the Carone Assoc. Account by third parties) was then transferred directly to the Carone Amex Accounts, which, as described above, discharged personal credit card debts incurred by F. Carone and members of his immediate family. And, like the payments into the Carone Assoc. Account, the corresponding outgoing payments to the Carone Amex Accounts continued after F. Carone resigned as Chief of Staff, with another $232,025.24 being paid directly to discharge F. Carone's personal credit card debt in 2023.

27. Based on my training and experience and involvement in this investigation, I believe the facts outlined above establish probable cause to believe that F. Carone devised and executed a scheme to solicit bribes and kickbacks from third parties either doing business with, or seeking to do business with, the City, and then to launder those funds through the long-dormant Carone Assoc. Account, in which he had no nominal interest, before being used to finance his personal lifestyle. As described below, there is also probable cause to believe that the applied-for warrant will yield evidence, fruits, and instrumentalities of such conduct.

The Target Account

28. There is probable cause to believe that, despite being nominally owned by A. Carone, the Carone Assoc. Account was controlled by F. Carone and that F. Carone transferred the third-party funds to his own benefit through the Carone Amex Accounts.

29. A tax return (IRS Form 1065) submitted by Carone & Associates, PLLC for 2022, which I have reviewed, does not declare any of the cash-on-hand in the Carone Assoc. Account. Based on conversations I have had with representatives of the tax preparer for Carone & Associates, PLLC, and relevant records the tax preparer has maintained, I know that, for tax purposes, A. Carone's law practice did not disclose or assert an ownership interest in any of the funds that passed through the Carone Assoc. Account in 2022.

30. Moreover, several of the unique IP addresses used to access the Carone Assoc. Account were also used to access the Target Account which, as explained below, is owned by F. Carone.

31. In particular, on or about June 18, 2024, in response to a grand jury subpoena, Apple provided records and information pertaining to the **Target Account** (the "Apple Records"). The Apple Records contained information pertaining to the IP addresses that were used to access the

**Target Account**. Based on my review of those records, I know that in 2022, the following seven unique IP addresses (among others) were used to access the Carone Assoc. Account: 38.140.163.118; 75.99.33.206; 67.247.104.223; 2603:7000:2701:90eb:48d9:f6ef:3708:c192; 2603:7000:2701:90eb:35bd:cda9:b820:f453; and 50.74.255.170.

32. Records obtained from Flagstar Bank concerning the Carone Assoc. Account also contained information pertaining to the IP addresses that were used to access the Carone Assoc. Account, including on the dates that transfers of funds to the Carone Amex Accounts were initiated. Based on my review of those records, I know that, during the same period, the following three IP addresses were also used to access the Target Account approximately 885 times:

- 38.140.163.118 (42 times)
- 67.247.104.223 (440 times)
- 50.74.255.170 (403 times)

33. What's more, records obtained from American Express, which I have reviewed, reveal that all but one of the transfers from the Carone Assoc. Account to the Carone Amex Accounts were conducted via American Express's user account web portal. And on each of the dates such a payment was made, the web portal was accessed through the IP address 38.140.163.118, (among others).

34. Based on my training and experience, and involvement in this investigation, I believe these facts establish probable cause to believe that, despite being nominally owned by A. Carone, the Carone Assoc. Account was controlled at all relevant times by F. Carone, who effectuated the transfers of third-party funds received into the Carone Assoc. Account to his own personal benefit through the Carone Amex Accounts.

35. I further believe that probable cause exists to believe that the applied-for warrant for the **Target Account** will yield evidence, fruits and instrumentalities of the Target Offenses. For starters, the **Target Account** is registered to, and owned by, F. Carone. The Apple Records reflect that the **Target Account** was created on December 8, 2016, and is registered to F. Carone at 2626 National Drive, Brooklyn, New York 11234. Public reporting confirms that the same F. Carone who is the target of this investigation owns the property located at 2626 National Drive. *See, e.g.*, Sheridan Wall, *Ex-Eric Adams aide Frank Carone lists Mill Basin mansion for $6.9M*, THE REAL DEAL (Apr. 24, 2024), https://therealdeal.com/new-york/2024/04/24/frank-carone-lists-mill-basin-mansion-for-6-9m/ (last visited Oct. 25, 2024); Julianne Cuba, *Frank Carone is selling his Mill Basin mansion for $7M*, CRAIN'S NEW YORK BUSINESS (Apr. 26, 2024), https://www.crainsnewyork.com/real-estate/frank-carone-selling-his-mill-basin-home-7-million (last visited Oct. 25, 2024).

36. So too is there probable cause to believe that the information sought by the applied-for warrant exists on the **Target Account**. The Apple Records reflect that, since the time of its creation, the **Target Account** has been accessed from numerous Apple devices, all registered to F. Carone. As relevant here, the Apple Records reflect that on or about September 3, 2020, the **Target Account** was registered to an iPhone 11 Pro Max, and remained registered to that device until December 15, 2023, when the **Target Account** was re-registered to an iPhone 15 Pro Max. Based on this information, there is probable cause to believe that the **Target Account** was continuously registered to one Apple device belonging to Carone during the Relevant Time Period.

37. The Apple Records further reflect that, since the time of its creation, the **Target Account** has been used to access various Apple features, including iCloud backup. In fact, the Apple Records reflect that the **Target Account** was backed up to the iCloud as recently as June

17, 2024. The Apple Records additionally reflect that the **Target Account** has repeatedly been used to access features including, but not limited to, bookmarks, calendars, iCloud photos, contacts, messages, notes, and web browsing. As such, based on my training and experience, I believe the **Target Account** includes backups of text messages, emails, and calendar invitations which may reflect specific communications and meetings that F. Carone had with individuals involved in the alleged pay-to-play scheme described above. To be sure, the Apple Records reflect that the FaceTime/iMessage Phone and Verified Phone number for the **Target Account** is [redacted], *i.e.*, the call number assigned to the F. Carone Phone that was used to communicate with Zhu in the months preceding Sapphire Hotel LLC's payments to the Carone Assoc. Account and the City's awarding of a lucrative municipal contract to Sapphire Hotel LLC. The **Target Account** may also contain bank statements and communications regarding the Carone Amex Accounts which would establish that F. Carone used the funds in Carone Assoc. Account to finance his personal expenses, as opposed to expenses related to the nominal account owner, Carone & Associates, PLLC.

38. Moreover, based on my training and experience, I know that iCloud often stores messages sent via third-party encrypted messaging applications, including WhatsApp, which is an encrypted messenger application based outside the United States. As such, it is beyond the jurisdictional reach of U.S. legal process. Accordingly, one of the only ways to access encrypted messages on WhatsApp is through an iCloud search warrant. Based on my review of evidence collected to date, including an interview in which I participated with a business associate of F. Carone, I am aware that F. Carone has a WhatsApp account associated with the F. Carone Phone. I also am aware that individuals often use encrypted messaging applications, such as WhatsApp, to communicate about illegal conduct to evade law enforcement detection. Thus, the

**Target Account** may well include F. Carone's encrypted messages regarding the pay-to-play scheme which otherwise would be beyond the reach of U.S. legal process.

39. Accordingly, based on all the information set forth herein, there is probable cause to believe that the **Target Account** will contain evidence of, among other things, F. Carone's communications regarding the scheme described above, as well as bank statements, credit card statements, and electronic documents and notes associated with the alleged Target Offenses.

40. On September 5, 2024, the investigation submitted a formal request to Apple to preserve the **Target Account**, including all stored communications, records, and other evidence related to the **Target Account** in Apple's possession.

## INFORMATION REGARDING APPLE ID AND iCLOUD[3]

41. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

42. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

---

[3] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

43. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

44. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and

responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

45. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

46. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

47. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address

and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

48. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some

of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

49. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

50. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

51. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

52. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

53. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

54. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

55. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

56. Based on the forgoing, I request that the Court issue the proposed search warrant.

57. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

58. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALINGAND NON-DISCLOSURE

59. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is not public and the scope of which is not known to all of the subjects and targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give subjects and targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, influence potential witnesses, notify confederates or otherwise seriously jeopardize the investigation. Some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process). If alerted to the existence of the warrant, there is reason to believe that the subjects under investigation will destroy that evidence and change their patterns of behavior.

60. Pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding Apple not to notify any person (including

subscribers or customers of the account(s) listed in the attached warrant) of the existence of the attached warrant for the period of one year from the date of the Order, except that Apple may disclose the warrant to its respective attorney for the purpose of receiving legal advice.

Respectfully submitted,

[redacted]

Anthony Cunder
Special Agent
United States Attorney's Office, Eastern District of New York

Subscribed and sworn to before me on December 2, 2024

[redacted]

THE HONORABLE STEVEN TISCIONE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with fcarone@abramslaw.com and DSID [redacted] (the "account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, CA 95014.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all emails associated with the account since December 1, 2021, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d. The contents of all instant messages associated with the account since December 1, 2021, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and

query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h. All records pertaining to the types of service used;

i. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of Title 18, United States Code, Sections 201 (bribery); 371 (conspiracy); 666 (government program fraud); 1001 (false statements); 1343 (wire fraud); 1344 (bank fraud); 1346 (honest services fraud); 1349 (wire/bank fraud conspiracy); 1956 (money laundering); and 1957 (unlawful monetary transactions) (collectively, the "Target Offenses"), involving Frank V. Carone, Anthony J. Carone, and others known and unknown, between December 1, 2021 and the Present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. Records, information, communications and documents relating to or constituting evidence that Frank V. Carone, Anthony J. Carone, or any person at the direction of, or in concert with, those individuals solicited or accepted bribes from or one or more persons or entities doing business with, or seeking to do business with, the City of New York;

b. Records, information, communications and documents relating to or constituting evidence of the financial condition of the Bus Company or any of its affiliated entities between November 1, 2017 and December 31, 2018;

c. Calendar entries, contacts, telephone call logs, images, bookmarks, photos, audio and/or video recordings, text messages, notes, and web browsing history associated with the above-referenced conduct;

d. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

e. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the account subscriber;

f. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

g. Evidence indicating the subscriber's state of mind as it relates to the crimes under investigation; and

h. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.