# Exhibit 2

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Frank Carone and His Devices

Case No. **26 MAG 2484**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the Southern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attached Affidavit and its Attachment A-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 71, 666, 1952, 1346; 1349, 1951, 1956, 1512(c), 1519; 26 USC 7206 | Conspiracy; federal program fraud; Travel Act bribery; honest-services wire fraud; wire fraud conspiracy; extortion under color of law; obstruction of justice; subscribing to false tax return |

The application is based on these facts:

Please see attached affidavit and its Attachment A-1

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* __________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[redacted]

Special Agent Anthony Cunder, USAO-EDNY
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: June 23, 2026

[redacted]
*Judge's signature*

City and state: New York, New York

The Honorable Ona T. Wang, U.S.M.J.
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of the United States of America for Search and Seizure Warrants for Persons of Frank Carone and Anthony Carone and Any Electronic Devices in their Respective Possession, Custody, or Control, USAO No. 2024R00298

**26 MAG 2484**

**TO BE FILED UNDER SEAL**

**APPLICATION**

**Agent Affidavit in Support of Application for a Search and Seizure Warrant**

**_____ Mag. _________**

I, Anthony Cunder, being first duly sworn, hereby depose and state as follows:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Office of the United States Attorney for the Eastern District of New York ("USAO-EDNY") and have been since 2022. As such, I am a "federal law enforcement officer" for purposes of Rule 41. I am currently assigned to the Public Integrity Section, which is focused on investigating and prosecuting white collar crimes, including, but not limited to, economic crimes such as mail, wire, and bank fraud, healthcare fraud and money laundering, and public corruption-related offenses such as bribery, government program fraud and honest services fraud. I have both led and supported numerous investigations, during which I have employed various investigative techniques, including, but not limited to, surveillance, de-briefing witnesses, executing search warrants and reviewing electronic evidence maintained by Internet service providers, such as Apple. This affidavit is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement officers and my training and experience concerning the investigation of white-collar crimes.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search (1) the person of FRANK CARONE ("F. CARONE"), including any closed containers in his possession, custody, and control, for electronic devices, including the cellular telephone with call number [redacted] (the "F. CARONE PHONE"), for the things described in Attachment A-1; and (2) the person of ANTHONY CARONE ("A. CARONE," and together with F. CARONE, the "SUBJECT PERSONS"), including any closed containers in his possession, custody, and control, for electronic devices, including the cellular telephone with call number [redacted] (the "A. CARONE PHONE," and, together with the F. CARONE PHONE and other devices recovered from A. CARONE and F. CARONE, the "SUBJECT DEVICES"), for the things described in Attachment A-2.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrants and does not set forth all my knowledge about this matter.

**B. The Subject Persons and Subject Devices**

4. As set forth in Attachments A-1 and A-2, this application seeks authorization to search the persons of F. CARONE and A. CARONE to seize and search any electronic devices respectively found in their possession, custody, or control, including, respectively, the F. CARONE PHONE and the A. CARONE PHONE.

5. F. CARONE is particularly described as a Caucasian male, whose date of birth is [redacted] and social security number is [redacted]. F. CARONE is approximately 5'6 tall, and weighs approximately 180 lbs. As relevant to this application, in 2022, F. CARONE served as Chief of Staff to the Mayor of New York City. He also operates a law firm, which is

identified in Exhibit A (described below) as "Law Firm #1," hereinafter referred to as the "F. CARONE Law Firm." The following photograph depicts F. CARONE.



6. Based on my review of records obtained during the course of the investigation, including copies of tax returns, bank records, and records accessible in law enforcement databases, I know that F. CARONE maintains residences at [redacted], and [redacted]. Based on my review of recent cell-site location information for the F. CARONE PHONE, which was obtained pursuant to a judicially-authorized warrant issued by the Honorable Anne. Y. Shields, United States Magistrate Judge for the Eastern District of New York, on June 15, 2026, I have reason to believe that F. CARONE is currently in New York State. In fact, as of June 22, 2026, location information placed the F. CARONE PHONE in Manhattan. I thus anticipate executing the applied-for warrant in the Southern District of New York.

7. The investigation has revealed that F. CARONE uses the F. CARONE PHONE. On or about December 2, 2024, the Honorable Steven L. Tiscione, United States Magistrate Judge for the Eastern District of New York, authorized a warrant to search an iCloud account associated with F. CARONE. The verified phone number associated with that iCloud account was the F. CARONE PHONE. The contents of that search warrant, including messages contained on the iCloud account, confirmed that the F. CARONE PHONE belongs to and is used by F. CARONE.

8. A. CARONE is particularly described as a Caucasian male, whose date of birth is [redacted] and social security number is [redacted] A. CARONE is approximately 5'4 tall, and weighs approximately 160 lbs. As relevant to this application, A. CARONE serves as a law partner in a Brooklyn-based law firm, which is identified in Exhibit A (described below) as "Law Firm #2," hereinafter referred to as the "A. CARONE Law Firm." The following photograph depicts A. CARONE.



9. Based on my review of property records as well as records contained in law enforcement databases, I know that ANTHONY CARONE resides at [redacted]. I also know that A. CARONE maintains residences at [redacted], and [redacted] However, based on my review of recent cell-site location information for the A. CARONE PHONE, which was obtained pursuant to a judicially-authorized warrant issued by Judge Shields on June 15, 2026, I have reason to believe that A. CARONE resides in his Manhattan apartment on weekdays. In fact, as of June 22, 2026, location information placed the A. CARONE PHONE in Manhattan. I thus anticipate executing the applied-for warrant in the Southern District of New York.

10. The investigation has revealed that A. CARONE uses the A. CARONE PHONE. In reviewing an iCloud account associated with A. CARONE's brother, Frank Carone ("F.

Carone”), law enforcement obtained text messages involving A. CARONE using the A. CARONE PHONE. Law enforcement also obtained an iCloud search warrant for another subject of the investigation, Yan Po Zhu, also known as Andy Zhu (identified below), which account also included messages with A. CARONE using the A. CARONE PHONE.

**C. The Subject Offenses**

11. Based on the facts as set forth in this affidavit, there is probable cause to believe that the persons and/or properties to be searched described herein contain evidence, contraband, instrumentalities, and fruits of violations of, among other things, Title 18, United States Code, Sections 371 (conspiracy); 666 (government program fraud); 1952 (use of interstate facilities to commit bribery); 1346 (honest-services wire fraud); 1349 (wire fraud conspiracy); 1951 (extortion under color of official right); 1956 (money laundering); 1512(c) (obstruction of justice); and 1519 (falsification of records in connection with federal investigation) and Title 26, United States Code, Section 7206 (subscribing to a false tax return) (collectively, the “Subject Offenses”), as described in Attachments A-1 and A-2.

**D. Jurisdiction**

12. This Court has jurisdiction to issue the requested warrants because it is “a court of competent jurisdiction” as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is “a district court of the United States . . . that has jurisdiction over the offense being investigated.” 18 U.S.C. § 2711(3)(A)(i).

**II. Probable Cause**

13. The USAO-EDNY, in conjunction with the Federal Bureau of Investigation, the Internal Revenue Service, and the New York City Department of Investigation, is investigating a corruption scheme involving F. CARONE, his brother Anthony Carone (“A. CARONE”), a hotel

owner in Long Island City named Yan Po Zhu, also known as Andy Zhu, and Zhu's manager named Crystal Chen, to obtain a multi-million-dollar contract from a New York City agency to operate Zhu's hotel, the Microtel, as an emergency migrant shelter, in exchange for bribes paid to F. CARONE through A. CARONE.

14. On or about June 12, 2026, a grand jury sitting in the Eastern District of New York returned an indictment (the "Indictment") charging F. CARONE, A. CARONE, Zhu, and Chen, variously, with violating Title 18, United States Code, Sections 371 (conspiracy); 666 (government program fraud); 1952 (use of interstate facilities to commit bribery); 1346 (honest-services wire fraud); 1349 (wire fraud conspiracy); 1956 (money laundering); and 1512(c) (obstruction of justice), as well as Title 26, United States Code, Section 7206 (subscribing to a false tax return) (collectively, the "Indictment Offenses"). The Indictment is attached hereto and incorporated by reference as Exhibit 1.

15. As described in the Indictment, the defendants devised and executed a scheme to exploit New York City's migrant crisis for their personal profit. In his official capacity as Chief of Staff, F. CARONE agreed to accept a series of bribe payments from Zhu and Chen through A. CARONE. The bribe payments totaled $120,000. In exchange, F. CARONE agreed to use his influence as a New York City official to steer a multimillion-dollar emergency shelter contract to the Microtel. To conceal the criminal nature of the scheme, Zhu and Chen directed the bribe payments to a bank account associated with the A. CARONE Law Firm (the "A. CARONE Law Firm Account"). A. CARONE then caused those funds to be disbursed from the A. CARONE Law Firm Account for F. CARONE's personal benefit in two ways: (1) by paying F. CARONE's personal credit card bills; and (2) by transferring funds to a bank account associated with the F. CARONE Law Firm.

16. As described in the Indictment, the bribe payments from Zhu that were deposited into the A. CARONE Law Firm Account were comingled with legal fees from other clients that F. CARONE had referred to A. CARONE while F. CARONE worked as Chief of Staff. A. CARONE deposited those client fees into the A. CARONE Law Firm Account and then, together with F. CARONE, steered the majority of those funds back to F. CARONE. Specifically, A. CARONE directed F. CARONE's personal assistant to transfer the funds out of the A. CARONE Law Firm Account to F. CARONE's personal credit card account, which F. CARONE used predominantly for his personal expenses, including charges for travel, dining, fitness memberships, clothing purchases, groceries, and the like. F. CARONE and A. CARONE used this pre-existing financial arrangement to conceal the bribe payments made by Zhu.

17. F. CARONE did not report the bribe payments as income to the Internal Revenue Service ("IRS") or any other government agency. A. CARONE and his law firm did not initially report the bribe payments or hundreds of thousands of dollars in fees paid into the A. CARONE Law Firm Account as income either, though, as described in greater detail below, A. CARONE later amended his taxes to account for that money after he came to learn that he was under federal investigation.[1]

---

[1] In a prior application for a warrant to search an iCloud account associated with F. CARONE bearing Magistrate Number 24-MJ-640, I previously stated that, "for tax purposes, A. Carone's law practice did not disclose or assert an ownership interest in any of the funds that passed through the [A. CARONE Law Firm Account] in 2022." After that application was submitted, I obtained additional information and records indicating that certain portions of the funds paid into the account, specifically, only those funds that A. CARONE had reason to believe the IRS was already aware of, were disclosed as income earned in 2022. As explained herein, even with the disclosure of those funds, not all of the funds in the A. CARONE Law Firm Account were disclosed to the IRS in 2022.

18. As described in the Indictment, by spring 2024, F. CARONE and A. CARONE had become aware of a federal grand jury investigation. To conceal the illegal nature of the bribery scheme and otherwise obstruct the investigation, F. CARONE and A. CARONE fabricated evidence to create the impression that the payments from the A. CARONE Law Firm Account to F. CARONE's personal credit card account and to the F. CARONE Law Firm were personal loans made by A. CARONE to F. CARONE. As part of that scheme to obstruct, in approximately July 2024, F. CARONE and A. CARONE created and executed a document purporting to be a promissory note, which they backdated to January 2022.

19. A. CARONE provided the promissory note to the government on or about October 26, 2025, in response to a grand jury subpoena issued to the A. CARONE Law Firm. The promissory note was attached to an email dated October 7, 2024, between A. CARONE and F. CARONE. The metadata associated with the attached promissory note reflects that the file was created on or about July 1, 2024. Both the email and attached promissory note are depicted below.

**From:** Anthony Carone [redacted]
**Sent:** [redacted]
**To:** [redacted]
**Subject:** Note
**Attachment:** 10072024_PROMISSORY NOTE.pdf

Anthony J. Carone, Esq
Carone & Associates, PLLC
2055 Flatbush Avenue
Brooklyn, NY 11234
Phone: [redacted]
Facsimile: [redacted]
**WIRE FRAUD IS REAL – DO NOT SEND ANY WIRES TO THIS OFFICE WITHOUT FIRST CALLING TO CONFIRM THE WIRE INSTRUCTIONS**

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are herewith notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by return email and delete the original message. If you are the intended recipient and have any problems with this transmission or are unable to open any attachment hereto, please contact the sender at the telephone number listed above. Thank you.

**PROMISSORY NOTE**

January 1, 2022
Brooklyn, New York

**Up to $500,000.00**

**FOR VALUE RECEIVED** in the form of advances of up to $500,000.00, **Frank V. Carone, Jr.** ("Borrower"), having an address at [redacted], promises to pay to **Anthony J. Carone** ("Lender"), having an address at [redacted] the principal sum of up to $500,000.00, with interest thereon to be computed on the actual amounts advanced by Lender on behalf of Borrower, on a daily basis and on the basis of a three hundred sixty (360) day year, at the rate of 2% per annum. The entire unpaid balance of principal and interest shall be paid in full by December 31, 2025.

The indebtedness evidenced by this Note may be prepaid in whole or in part without penalty at any time.

This Note may not be changed or terminated orally.

IN WITNESS WHEREOF, the parties have executed this agreement the day and year first above written.

Frank V. Carone, Jr.

20. [redacted]

21. [redacted]

22. [redacted]

[redacted]

23. [redacted]. [2] [redacted]

[2] Investigators have identified one check from the A. CARONE Law Firm to the F. CARONE Law Firm, dated June 27, 2022, in the amount of $15,750 with the memo line "loan." This check was executed several months before Zhu and Chen began bribing F. CARONE through A. CARONE.

[redacted][3] [redacted].[4]

24. [redacted] when coupled with the evidence of the bribery scheme described in the Indictment, reflects that A. CARONE and F. CARONE fabricated the promissory note in response to the government's investigation and, [redacted][5] conveyed false information about the circumstances of the backdated promissory note's creation in order to dissuade the government from investigating further.

25. Apart from creating and backdating a promissory note, the investigation has revealed that F. CARONE and A. CARONE took other steps to conceal their scheme. For instance, in or around November 2024, weeks after the government issued subpoenas to various clients

---

3 [redacted]

4 [redacted]

5 [redacted]

whose fees were comingled with the bribe money in the A. CARONE Law Firm Account, A. CARONE instructed his accountant that he needed to amend his 2022 tax returns because he "inadvertently excluded" "income deposited into [the A. CARONE Law Firm]." Months later, A. CARONE amended his 2022 tax returns to declare as income the hundreds of thousands of dollars received in the A. CARONE Law Firm Account he previously did not report.

26. Likewise, as described above, law enforcement previously obtained judicially-authorized search warrants for both F. CARONE's and Andy Zhu's respective iCloud accounts. Zhu's iCloud included a number of relevant text messages between Zhu and F. CARONE, some of which are contained in the Indictment. See, e.g., Ex. 1 ¶¶ 45–46. Even though F. CARONE's iCloud account contained relevant text messages and other content during the same period, including messages between F. CARONE and Zhu immediately before and after the incriminating text messages, none of the incriminating text messages between F. CARONE and Zhu were located on F. CARONE's iCloud, indicating that those messages were likely deleted by F. CARONE from F. CARONE's iCloud account.

27. Based on the foregoing, there is probable cause to believe that the SUBJECT DEVICES contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSES. As described in the Indictment, A. CARONE, F. CARONE and their co-conspirators used electronic devices to commit their crimes, including by sending text messages, emails and other electronic messages to one another. See, e.g., Ex. 1 ¶¶ 18–19, 23, 26–27, 36, 44–46, 49(a)–49(d), 49(f), 49(j). Even though the investigation includes evidence that F. CARONE deleted evidence, based on my training and experience, I know that there are times when relevant messages can be recovered from one's physical device even though they are not available on an iCloud account. Finally, based on the above, and my training, experience, and involvement in the investigation, I

have probable cause to believe that evidence of F. CARONE's attempts to obstruct justice may be present on the SUBJECT DEVICES, including because obstructive acts were taken at various points in response to grand jury subpoenas issued to third party individuals and entities.

## III. Technical Background

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually

be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals.

When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant ("PDA") is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address ("IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29. Based on my training, experience, and research, I know that certain electronic devices, including the F. CARONE PHONE and A. CARONE PHONE have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and tablet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## IV. Biometric Unlocking

30. In my training and experience, it is likely that the SUBJECT DEVICES will have biometric unlocking features, such as fingerprint unlocking. The warrants for which I am applying would permit law enforcement to compel F. CARONE and A. CARONE to unlock the SUBJECT DEVICES pursuant to the warrants using the device's biometric features. I seek this authority based on the following:

31. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, including Apple iPhones and iPads, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

32. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

33. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in

front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

34. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

35. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found. The passcode or password(s) that would unlock the devices subject to search under these warrants are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

36. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156

hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

37. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to these warrants and it may be unlocked using one of the aforementioned biometric features, the warrants for which I am applying would permit law enforcement personnel to:

a. press or swipe F. CARONE's and A. CARONE's fingers (including thumbs) against the fingerprint scanner of the SUBJECT DEVICES;

b. hold F. CARONE and A. CARONE in place while holding the SUBJECT DEVICES in front of their respective faces to activate the facial recognition feature; and/or

c. hold F. CARONE and A. CARONE in place while holding the SUBJECT DEVICES in front of their respective faces to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

38. *Return of Property*. If the government determines after searching electronic devices seized pursuant to these warrants that a particular device is no longer necessary to retrieve and preserve the data, and that device itself is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the government will return that device. Electronic data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the SUBJECT OFFENSES.

39. *Good Cause to Execute Warrants in the Very Early Morning Hours*: I seek authorization to execute the applied-for warrants in the very early morning hours, particularly between approximately 5:00 a.m. and 6:00 a.m., as deemed necessary by law enforcement agents. The execution of the applied-for warrants and anticipated arrests of the defendants charged in the Indictment are being coordinated in parallel with an independent law enforcement operation being conducted by a different United States Attorney's Office because of a common subject to both investigations. I understand that law enforcement anticipates executing pre-dawn searches of certain subjects of that investigation, including the individual who is also a subject of this investigation, because of concerns that evidence would be destroyed and/or subjects would not be present in their homes absent authorization to execute before 6:00 a.m. I therefore seek authorization to execute the applied-for warrants at any time in order to prevent the potential destruction of evidence in this case caused by the very early morning searches executed in the separate law enforcement operation. Moreover, because this application seeks permission to search the contents of electronic devices, once electronic devices are in the possession of law enforcement, the execution of the warrants to search those contents does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants on the contents of electronic devices at any time in the day or night.

**V. Conclusion and Ancillary Provisions**

40. I submit that this affidavit supports probable cause for warrants to search the properties and/or persons and to seize the items described in Attachments A-1 and A-2.

41. Furthermore, I respectfully request that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including this

affidavit and the requisite inventory notice. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that participants in fraudulent schemes often actively search for criminal affidavits and search warrants via the Internet and may disseminate them to other participants in the scheme as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

[redacted]

Anthony Cunder
Special Agent
USAO-EDNY

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this __ day of June, 2026

[redacted]

THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# ATTACHMENT A-1

## I. Person to Be Searched – Subject Person

The person to be searched is Frank Carone, who is particularly described as a Caucasian male, with a birth is [redacted] and social security number is [redacted], and who is approximately 5'6 tall and weighs approximately 180 lbs, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant. The following photograph depicts the Subject Person.



## II. Items to be Seized

### A. The Subject Devices

Law enforcement personnel are authorized to seize any and all cellphones, laptop computers, tablets, or other electronic devices found in the possession, custody, or control of the Subject Person, including a cellular telephone assigned call number [redacted] (collectively, the "Subject Devices"), on the condition that the Subject Person is located in the Southern District of New York at the time of the execution of the warrant.

### B. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Person consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371 (conspiracy); 666 (government program fraud); 1952 (use of interstate facilities to commit bribery); 1346 (honest-services wire fraud); 1349 (wire fraud conspiracy); 1951 (extortion under color of official right); 1956 (money laundering); 1512(c) (obstruction of justice); and 1519 (falsification of records in connection with federal investigation) and Title 50, United States Code, Section 7206 (the "Subject Offenses") involving the Subject Person and others, known and unknown, between (a) January 1, 2022 and December 31, 2023, (b) June 1, 2024 and November 31, 2024; and (c) April 1, 2025 and the Present, described as follows:

1. Any items or records needed to access the data stored on any seized or copied cellphone, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the electronic devices, including any hardware or software manuals or other information concerning the configuration of the seized or copied electronic devices.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied electronic devices.

4. Written passwords, login credentials, notes, or other documentation related to online accounts, social media platforms, or access to electronic devices.

5. Printed photographs, images, or documents containing depictions of minors or related to the Subject Offenses.

**III. Data to be Seized**

The data to be seized from the Subject Devices consist of the following evidence, fruits and instrumentalities of violations of the Subject Offenses:

1. Records, information, communications and documents relating to or constituting evidence that the Subject Person or any person at the direction of, or in concert with, the Subject Person received one or more thing(s) of value from or one or more persons seeking to do business with the City of New York (including, but not limited to, any contracts awarded or funds obtained by the Sapphire Hotel LLC, d/b/a “Microtel LIC”),

2. Records, information, communications and documents relating to or constituting evidence that the Subject Person attempted to obstruct a federal investigation;

3. Calendar entries, contacts, telephone call logs, images, bookmarks, photos, audio and/or video recordings, text messages, notes, and web browsing history associated with the above-referenced conduct in (a) and (b);

4. Evidence indicating how and when the Subject Devices were accessed or used, to determine the chronological and geographic context of access, use and events relating to the crimes under investigation and the account subscriber;

5. Evidence and information related to communications about the Subject Offenses;

6. Evidence and information related to in-person, virtual, or telephonic meetings involving one or more coconspirators, including individuals whose identities are not yet known, including audio or video recordings of such meetings or calls, notes and summaries of such meetings or calls, and communications reflecting or referring to in-person meetings and telephone calls;

7. Information related to the physical location of the Subject Person and any other coconspirators, individuals whose identities are not yet known, including Global

Positioning System location data, Internet Protocol address information, photographs, videos, audio recordings, and communications;

8. Financial records, including all bank records, checks, credit card bills, and account information related to the crimes listed in this warrant;

9. Photographs, videos, and/or audio recordings, including voicemails, of or related to the Subject Person and/or other coconspirators, including individuals whose identities are not yet known, related to the Subject Offenses;

10. Information related to evidence indicating how and when electronic communications accounts (e.g., cellular devices, email accounts, social media accounts, and other messaging platforms, including Signal) were accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the account subscribers;

11. Evidence indicating the state of mind of the Subject Person and/or other coconspirators, as it relates to the crimes under investigation;

12. Information related to evidence of aiding and abetting and conspiring to commit the Subject Offenses; and

13. Any evidence regarding concealment of the above-outlined schemes.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## IV. Unlocking Devices with Biometric Features

During the execution of the warrant, law enforcement personnel are authorized to obtain from the Subject Person the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock a Subject Device, including to (1) press or swipe the fingers (including thumbs) of the Subject Person to the fingerprint scanner of the Subject Device(s); (2) hold the Subject Device(s) in front of the face of the Subject Person to activate the facial recognition feature; and/or (3) hold the Subject Device(s) in front of the face

of the Subject Person to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

# EXHIBIT 1

RCH/CMM:SKW/AT/EWS
F. #2024R00298

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* JUNE 12, 2026 *
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------- X

UNITED STATES OF AMERICA

- against -

ANTHONY J. CARONE,
FRANK V. CARONE,
CRYSTAL CHEN and
YAN PO ZHU,
also known as "Andy Zhu,"

Defendants.

-------------------------- X

INDICTMENT

Cr. No. 26-CR-177
(T. 18, U.S.C., §§ 371, 666(a)(1)(B), 666(a)(2), 981(a)(1)(C), 982(a)(1), 982(b)(1), 1343, 1346, 1349, 1512(c)(2), 1952(a)(3)(A), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 26, U.S.C., § 7206(1); T. 28, U.S.C., § 2461(c))

Judge Kiyo A. Matsumoto
Magistrate Judge James R. Cho

THE GRAND JURY CHARGES:

## INTRODUCTION TO ALL COUNTS

At all times relevant to this Indictment, unless otherwise indicated:

### I. Relevant Individuals and Entities

1. The defendant ANTHONY J. CARONE was a resident of Queens County, New York, and an attorney duly admitted to practice law in New York State. A. CARONE was the brother of the defendant FRANK V. CARONE.

2. The defendant FRANK V. CARONE was a resident of Kings County, New York and Palm Beach County, Florida, and an attorney duly admitted to practice law in New York State. On or about January 1, 2022, F. CARONE was appointed Chief of Staff to the Mayor of New York City ("Chief of Staff"). F. CARONE resigned from that position on or about December 31, 2022.

3. The defendant CRYSTAL CHEN was a Chinese national who resided in Nassau County, New York. CHEN worked as the defendant YAN PO ZHU's, also known as "Andy Zhu," business manager at, among other places, the Microtel Inn by Wyndham (the "Microtel"), a 75-room hotel located at 29-12 40th Avenue in Queens County, New York.

4. The defendant YAN PO ZHU, also known as "Andy Zhu," was a Chinese national who resided in Nassau County, New York. ZHU owned and operated the Microtel. ZHU exercised control over the Microtel through one or more New York limited liability companies, including Holding Company #1 and Holding Company #2, entities the identities of which are known to the Grand Jury.

5. Law Firm #1, an entity the identity of which is known to the Grand Jury, was a New York professional service corporation engaged in the provision of legal and consulting services, with a principal place of business in Kings County, New York. The defendant FRANK V. CARONE owned and controlled Law Firm #1.

6. Law Firm #2, an entity the identity of which is known to the Grand Jury, was a New York professional service limited liability company engaged in the provision of legal services, with a principal place of business in Kings County, New York. The defendant ANTHONY J. CARONE was a partner of Law Firm #2. In or about May 2015, A. CARONE opened a bank account in the name of Law Firm #2 (the "Law Firm #2 Account"), which A. CARONE controlled. The Law Firm #2 Account remained dormant from its inception in May 2015 until approximately January 2022, when the defendant FRANK V. CARONE was appointed Chief of Staff.

7. City Official #1, an individual whose identity is known to the Grand Jury, was the Commissioner of the New York City Department of Social Services ("DSS"). In

approximately 2023, City Official #1 resigned from DSS and became employed at a New York business corporation providing consulting services that was owned and operated by the defendant FRANK V. CARONE.

8. City Official #2, an individual whose identity is known to the Grand Jury, was the First Deputy Commissioner for the New York City Department of Homeless Services ("DHS"), a subagency within DSS. City Official #2 reported to City Official #1.

9. City Official #3, an individual whose identity is known to the Grand Jury, was the Associate Commissioner for DHS. City Official #3 reported to City Official #2.

10. Consultant #1, an individual whose identity is known to the Grand Jury, was a consultant. In 2022, the defendants YAN PO ZHU and CRYSTAL CHEN retained Consultant #1 to apply for an emergency shelter contract from New York City on behalf of the Microtel.

## II. The 2022 New York City Migrant Crisis

11. In 2022, New York City ("NYC" or the "City") experienced an unprecedented influx of migrant asylum seekers. NYC was a "right to shelter" city, meaning the City was legally required to provide shelter to all homeless individuals who sought it. Because the volume of migrant asylum seekers needing housing outpaced NYC's existing shelter system, the City instituted a process for contracting with local hotels to house migrant asylum seekers (the "Emergency Shelter Contracts").

12. In sum and substance, in the Emergency Shelter Contracts, the City agreed to rent entire hotels for one year or more, turn over operational control to third-party organizations, and utilize the spaces as emergency shelters to house migrant asylum seekers. To identify and evaluate sites for potential Emergency Shelter Contracts, employees from DSS and

its constituent subagencies, the Human Resources Administration and DHS, solicited and reviewed proposals from local hotels. Following its own due diligence, DSS recommended that the City enter into Emergency Shelter Contracts with certain local hotels.

13. In order to fund DSS services, NYC received approximately $1.8 billion of federal grant money in 2022 and approximately $2.5 billion of federal grant money in 2023.

III. The Criminal Scheme

14. In or about and between June 2022 and December 2023, the defendants ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU devised and executed a scheme to exploit the City's migrant crisis for profit. Specifically, in his official capacity as Chief of Staff, F. CARONE agreed to accept a series of bribe payments from ZHU and CHEN through A. CARONE. In exchange, F. CARONE agreed to steer a multimillion-dollar Emergency Shelter Contract to the Microtel owned by ZHU and managed by CHEN. To conceal the criminal nature of the scheme, ZHU directed the bribe payments to the Law Firm #2 Account controlled by A. CARONE. A. CARONE then caused those funds to be disbursed for F. CARONE's personal benefit in two ways: (1) by paying F. CARONE's personal credit card bills; and (2) by transferring funds to a bank account for Law Firm #1, of which F. CARONE was the sole beneficial owner. In total, ZHU and CHEN paid approximately $120,000 to F. CARONE in exchange for an Emergency Shelter Contract for the Microtel, which was laundered through the Law Firm #2 Account by A. CARONE and his co-defendants.

A. Initial Efforts to Obtain an Emergency Shelter Contract for the Microtel

15. On or about December 29, 2021, the defendant FRANK V. CARONE announced that he was leaving the private sector to accept an appointment as Chief of Staff. Until that time, F. CARONE had provided legal and consulting services through Law Firm #1 and through a national law firm based in Kings County, New York and Nassau County, New York. F. CARONE assumed the position of Chief of Staff in or around January 2022.

16. Beginning in 2022, the defendants YAN PO ZHU and CRYSTAL CHEN tried to obtain an Emergency Shelter Contract for the Microtel. Initially, ZHU and CHEN hired Consultant #1, a consultant with experience navigating City government, to assist the Microtel in obtaining an Emergency Shelter Contract. Despite Consultant #1 making efforts on behalf of ZHU and CHEN, the Microtel was not awarded an Emergency Shelter Contract. At a meeting held on or about June 14, 2022, DSS officials informed CHEN that the Microtel was not a viable location for an Emergency Shelter Contract. DSS officials reached this conclusion in part due to the Microtel's location in Long Island City, Queens. Notably, by this time, a large number of hotels in Long Island City, Queens had already received shelter contracts, drawing sustained resistance from residents and community leaders.

17. As the defendants YAN PO ZHU and CRYSTAL CHEN's efforts to secure an Emergency Shelter Contract through Consultant #1 were stalling, ZHU leveraged his burgeoning personal relationship with the defendant FRANK V. CARONE. As depicted below, for example, on or about June 3, 2022, ZHU and CARONE socialized at ZHU's Nassau County residence:





18. That evening, the defendant YAN PO ZHU solicited the defendant FRANK V. CARONE's assistance in obtaining an Emergency Shelter Contract for the Microtel. In a text message sent that evening, for example, ZHU provided details about the Microtel to F. CARONE: "Microtel LIC 29-12 40th Avenue, LIC 75 rooms." Several days later, on or about June 6, 2022, ZHU and F. CARONE exchanged the following text messages:

ZHU: who I need contact with?

F. CARONE: About?

ZHU: regarding approval of my hotel (29-12 40th Avenue (LIC) for the shelter program. Who should I contact to

F. CARONE: Ok standby

19. On or about June 15, 2022, after learning from DSS officials that the Microtel had been rejected for an Emergency Shelter Contract, the defendant CRYSTAL CHEN texted Consultant #1 that "the location is a no currently." Nonetheless, CHEN told Consultant #1 that ZHU "is also speaking to someone else in the Mayor's office to see if we have another chance" for the Microtel to obtain an Emergency Shelter Contract. As noted above, since June 3, 2022, Zhu discussed the Emergency Shelter Contract with the defendant FRANK V. CARONE.

B. <u>The Defendant FRANK V. CARONE's Intervention on the Microtel's Behalf</u>

20. Following DSS's rejection of the Microtel for an Emergency Shelter Contract on or about June 14, 2022, the defendant FRANK V. CARONE used his official position to intercede on the Microtel's behalf. Among other things, in his official capacity as Chief of Staff, F. CARONE directed City Official #1, then the DSS Commissioner, to reconsider the Microtel for an Emergency Shelter Contract. Despite DSS's prior independent assessment that the Microtel was not a suitable location for a temporary shelter, due to F. CARONE's directive, City Official #1 did, in fact, cause DSS officials to reconsider the agency's decision.

21. On or about July 12, 2022, City Official #2 sent an email to DSS staff asking whether the Microtel's address "ring[s] a bell for anyone" because City Official #1 had begun "asking me about it." Consistent with DSS's prior rejection, City Official #3 responded that "[t]his is a proposed hotel conversion that has been brought to us many times . . . We have consistently told them no because it is directly next to [a different] shelter."

22. Around this same time, the defendants FRANK V. CARONE, ANTHONY J. CARONE, and YAN PO ZHU socialized frequently. As depicted below, for example, on or about August 13, 2022, F. CARONE and A. CARONE attended a gathering at ZHU's Nassau County residence:



23. The defendant YAN PO ZHU continued soliciting the defendant FRANK V. CARONE's assistance in obtaining an Emergency Shelter Contract for the Microtel. On or about September 19, 2022, for example, ZHU and F. CARONE exchanged the following text messages:

> ZHU: Hi Frank, hope all is well! We are interested in the immigrant emergency program. It would be helpful for my hotel if we can get at a one year program to start right away, and we can have time to work on long term programs. Can you please help me look into it? Thank you so much!
>
> F. CARONE: What is address?
>
> ZHU: 29-12 40 Ave Long Island city 11101
>
> Thank you my big guy

24. Approximately three days after that exchange, on or about September 22, 2022, the defendant FRANK V. CARONE spoke on the phone with City Official #1. One minute after that call ended, City Official #1 called City Official #2. Following that phone call, City Official #2 sent an email to DSS staff with the subject line, "Address from [City Official #1]." In substance and in part, that email directed DSS staff to "take a look" at the Microtel and provided the address of the hotel. Referring to the ongoing community resistance to additional Emergency Shelter Contracts in Long Island City, City Official #2 wrote that the Microtel was located in "LIC (I know)." In that email, City Official #2 identified the Microtel's point of contact as the defendant CRYSTAL CHEN.

25. Two days later, on or about September 24, 2022, the defendants FRANK V. CARONE and YAN PO ZHU socialized at ZHU's Nassau County residence, as shown in the photograph below:



26. Two days after that social event, on or about September 26, 2022, the defendant YAN PO ZHU continued to solicit the defendant FRANK V. CARONE's assistance in obtaining an Emergency Shelter Contract for the Microtel. In a text message that contained the Microtel's address, ZHU wrote, "My brother 29-12 40 Ave please help me get done we need to refinance."

27. On or about September 27, 2022, the defendant ANTHONY J. CARONE texted the defendant YAN PO ZHU "I want to talk to you about LIC," referring to ZHU's efforts to obtain an Emergency Shelter Contract for the Microtel. The following day, on or about September 28, 2022, A. CARONE and ZHU met at a social club in Manhattan. Later that evening, the defendant FRANK V. CARONE and City Official #1 also met at the same social club. That same day, despite DSS's repeated rejection of the Microtel for an Emergency Shelter Contract, the defendant CRYSTAL CHEN texted A. CARONE to confirm ZHU's understanding that the Microtel "was submitted yesterday," which was the same day that ZHU texted F. CARONE seeking his assistance in obtaining an Emergency Shelter Contract for the Microtel.

28. A few days later, on or about October 1, 2022, the defendant YAN PO ZHU met with the defendant FRANK V. CARONE at F. CARONE's home in Kings County, New York. Following this meeting, ZHU and the defendant CRYSTAL CHEN began making a

series of monthly payments to F. CARONE through the Law Firm #2 Account operated by the defendant ANTHONY J. CARONE.

C. The Consummation of the Bribery Scheme

29. On or about October 4, 2022, City Official #1 texted the defendant ANTHONY J. CARONE to reiterate that, given the concentration of hotels already awarded Emergency Shelter Contracts in Long Island City and continued community opposition, DSS had been focused on locating hotels in "places other than LIC" to operate as emergency shelters. Despite this message to A. CARONE, City Official #1 nevertheless advised subordinate officials at DSS to award an Emergency Shelter Contract to the Microtel. As discussed below, the contract award was the result of the defendant FRANK V. CARONE's directive to City Official #1 to consider the Microtel for an Emergency Shelter Contract.

30. On or about October 4, 2022, in response to overtures by City Official #1, City Official #2 sent another email to DHS staff concerning the Microtel under the subject line, "Address from [City Official #1]." In that email, City Official #2 requested that DHS staff again contact the defendant CRYSTAL CHEN for the purpose of discussing the Microtel's eligibility for an Emergency Shelter Contract. In response, City Official #3 lamented, "I'm not clear what else you want me to do here. We are aware of this site and have it on our hotel list. I defer to [staffer] and team on whether they want to push this up to [City Official #1] to approve to go to City Hall." City Official #2 advised City Official #3 that City Official #2 had informed City Official #1 that "we've taken this as far as we can go. So nothing left to do. Thanks for humoring me."

31. Amid continued opposition within DSS, City Official #1 continued his efforts to steer an Emergency Shelter Contract to the Microtel consistent with the directive he

had received from the defendant FRANK V. CARONE. On or about October 11, 2022, City Official #2 sent an email to DSS staff and provided the address for the Microtel and the contact information for the defendant CRYSTAL CHEN, stating that the Microtel had "come directly from the top . . . I know it is in LIC, but we should assume it is approved (confirmed with [City Official #1])."

32. Later that day, a DHS staffer circulated the names of two Long Island City hotels for consideration for Emergency Shelter Contracts, neither of which was the Microtel. Consistent with the directive from the defendant FRANK V. CARONE, City Official #1 told DHS staff not to move forward on those locations, as the Microtel had been given priority. The professional staff at DHS expressed renewed opposition, advising City Official #1 that the Microtel was "smaller than the other two" hotels proposed and could therefore house less migrant asylum seekers in a moment of crisis. Another DHS staffer lamented that replacing the professional staff's recommendations with the Microtel "mean[t] a loss of 75 units," which would necessitate opening "more locations" to make up the difference.

33. On or about October 20, 2022, DSS requested, and received, City Hall approval to award an Emergency Shelter Contract for the Microtel. On or about November 1, 2022, the Office of the Agency Chief Contracting Officer for NYC executed a letter of intent to award an Emergency Shelter Contract for the Microtel. The Microtel ultimately received $6,825,000 pursuant to Emergency Shelter Contracts, which inured to the financial benefit of the defendants YAN PO ZHU and CRYSTAL CHEN.

D. The Sham Retainer, Bribe Payments, and Tax Avoidance Scheme

34. After the defendant FRANK V. CARONE directed City Official #1 to steer an Emergency Shelter Contract to the Microtel despite opposition from staff at DSS, the

defendants YAN PO ZHU and CRYSTAL CHEN commenced making bribe payments to F. CARONE. To conceal the criminal nature of the scheme, ZHU and CHEN disguised the bribe payments as legal fees and directed the payments to the Law Firm #2 Account, which was controlled by the defendant ANTHONY J. CARONE.

35. In that regard, on or about October 14, 2022, Holding Company #2, an entity controlled by the defendant YAN PO ZHU, executed a document purporting to retain Law Firm #2 for assistance in obtaining an Emergency Shelter Contract for the Microtel (the "Sham Retainer Agreement"). The defendant CRYSTEL CHEN sent the Sham Retainer Agreement to the defendant ANTHONY J. CARONE. The Sham Retainer Agreement specified a 12-month term, during which ZHU and CHEN would make monthly payments of $10,000 to Law Firm #2 for a total payment of $120,000. Notably, A. CARONE did not inform his law partners at Law Firm #2 that ZHU had retained A. CARONE or Law Firm #2, nor did A. CARONE inform his law partners at Law Firm #2 that he was facilitating various cash payments from ZHU into the Law Firm #2 Account on behalf of the defendant FRANK V. CARONE and, in turn, funneling those payments back to F. CARONE in various ways.

36. The following week, on or about October 21, 2022, the defendant CRYSTAL CHEN discussed the ongoing bribery scheme with Individual #1, an employee of the defendant YAN PO ZHU whose identity is known to the Grand Jury. Individual #1 was responsible for wiring funds to the Law Firm #2 Account on behalf of ZHU and CHEN:[1]

CHEN: The boss completely trusts the two brothers.

. . .

[1] The messages described herein between CHEN and Individual #1 were originally in Mandarin and have been translated into English in sum and substance.

| | |
|---|---|
| Individual #1: | Isn't it just about giving 120,000? |
| | . . . |
| CHEN: | In the end, it's all about money and giving the two brothers a way out. |
| Individual #1: | How much? 120k? |
| CHEN: | Its still 12 |
| | . . . |
| | And they said that if there is a renewal, it will still be charged every month |
| | . . . |
| | He still said it was approved because of their contribution, no matter whose application it was. |
| | . . . |
| Individual #1: | I got 120,000 yuan for no reason, and I will continue to blackmail you in the future. |
| CHEN: | Then the boss said, "if [Consultant #1's] application had been approved two weeks earlier, we would not have signed the 12th one last week." |
| | Its all bullshit. |
| | The two brothers got a bargain for nothing. Then we begged them to accept it. Why… |

37. Consistent with the Sham Retainer Agreement and the defendant CRYSTAL CHEN's description of the scheme, CHEN and the defendant YAN PO ZHU directed a total of $120,000 to the Law Firm #2 Account as follows:

| Approximate Date | Payor | Wire Amount |
|---|---|---|
| October 14, 2022 | Holding Company #1 | $10,000.00 |
| November 10, 2022 | Holding Company #1 | $10,000.00 |
| December 8, 2022 | Holding Company #1 | $10,000.00 |
| February 24, 2023 | Holding Company #2 | $20,000.00 |
| March 10, 2023 | Holding Company #1 | $10,000.00 |
| April 11, 2023 | Holding Company #2 | $20,000.00 |
| May 8, 2023 | Holding Company #1 | $10,000.00 |
| June 16, 2023 | Holding Company #1 | $10,000.00 |
| July 20, 2023 | Holding Company #1 | $10,000.00 |
| September 21, 2023 | Holding Company #1 | $10,000.00 |

38. The bribe payments deposited into the Law Firm #2 Account were comingled with legal fees from other clients that the defendant FRANK V. CARONE referred to the defendant ANTHONY J. CARONE while F. CARONE served as Chief of Staff. A. CARONE deposited those client fees into the once-dormant Law Firm #2 Account and then steered the majority of the client fees to F. CARONE. F. CARONE and A. CARONE used this financial arrangement to convey and conceal the bribe payments made to F. CARONE by the defendants YAN PO ZHU and CRYSTAL CHEN.

39. In or about and between October 2022 and April 2023, the defendants FRANK V. CARONE and ANTHONY J. CARONE used most of the funds deposited into the Law Firm #2 Account for F. CARONE's personal benefit. Specifically, although neither F. CARONE nor his personal assistant was affiliated with Law Firm #2, F. CARONE and A. CARONE repeatedly directed F. CARONE's personal assistant to transfer funds from the Law Firm #2 Account to F. CARONE's personal credit card account, which he used predominantly

for his personal expenses, including charges for travel, dining, fitness memberships, clothing purchases, groceries, and the like.

40. Neither the defendant ANTHONY J. CARONE, nor Law Firm #2, nor the defendant FRANK V. CARONE reported the bribe payments to the Internal Revenue Service ("IRS") or any other government agency. Nor did they report hundreds of thousands of dollars of other client fees paid into the Law Firm #2 Account as income to the IRS or any other government agency.

41. The defendant FRANK V. CARONE did not report any of the funds that he received from the Law Firm #2 Account to the NYC Conflicts of Interest Board during the period he served as Chief of Staff, as he was required to do.

42. After the defendant FRANK V. CARONE resigned as Chief of Staff and returned to the private sector, he and the defendant ANTHONY J. CARONE changed the method they used to conceal F. CARONE's receipt of the bribe payments. In or about April 2023, A. CARONE began writing checks from the Law Firm #2 Account—which included the proceeds of the bribe payments made by the defendants YAN PO ZHU and CRYSTAL CHEN—to Law Firm #1, which F. CARONE owned and controlled. F. CARONE did not provide Law Firm #2, ZHU, or CHEN with legitimate services that would have entitled F. CARONE to such payments, nor did he disclose to the NYC Conflicts of Interest Board that he performed services for any clients doing business before the City, as he was required to do.

E. Breakdown of the Bribery Arrangement

43. On or about September 21, 2023, the defendants YAN PO ZHU and CRYSTAL CHEN made the last bribe payment owed to the defendant FRANK V. CARONE under the Sham Retainer Agreement.

44. On or about November 20, 2023, the defendant CRYSTAL CHEN emailed the defendant ANTHONY J. CARONE, requesting to terminate the Sham Retainer Agreement. By that time, the defendant YAN PO ZHU and CHEN had made the equivalent of 12 payments totaling $120,000, as called for in the Sham Retainer Agreement. Nonetheless—and despite no services having been provided for October 2023 or November 2023—A. CARONE responded, "Please immediately remit the fees for October and November and then we will consider this matter terminated."

45. The next day, no further payments having been made, the defendant FRANK V. CARONE texted the defendant YAN PO ZHU and stated, "I need to see you."

46. On or about December 25, 2023, the defendants FRANK V. CARONE and YAN PO ZHU exchanged a series of text messages regarding the bribe payments. Consistent with the defendant ANTHONY J. CARONE's stated belief that additional payments were owed, F. CARONE informed ZHU that he was "not happy about something" and would "not discuss[] [any future deals] until past is worked out." In response, referring to the bribe payments made under the Sham Retainer Agreement, ZHU stated that he had "asked my partners to pay you for a year."

F. <u>Obstruction of the Criminal Investigation</u>

47. By spring 2024, the defendants FRANK V. CARONE and ANTHONY J. CARONE had become aware of a federal Grand Jury investigation. To conceal the illegal nature of the bribery scheme described herein and otherwise obstruct the investigation, F. CARONE and A. CARONE fabricated evidence to create the impression that the payments from Law Firm #2 to F. CARONE's personal credit card account and to Law Firm #1 were personal loans made by A. CARONE to F. CARONE. As part of that scheme to obstruct, in

approximately July 2024, F. CARONE and A. CARONE created and executed a document purporting to be a promissory note, which they backdated to January 2022, and subsequently provided to federal investigators in October 2025.

COUNT ONE
(Conspiracy to Commit Offenses Against the United States)

48. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

49. In or about and between June 2022 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU, also known as "Andy Zhu," together with others, did knowingly and willfully conspire:

(a) for FRANK V. CARONE, being an agent of a local government, to wit: the City of New York, to corruptly solicit and demand for the benefit of F. CARONE and ANTHONY J. CARONE, and accept and agree to accept, one or more things of value from YAN PO ZHU, also known as "Andy Zhu," and CRYSTAL CHEN, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the City of New York involving things of value of $5,000 or more, while the City of New York was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance, contrary to Title 18, United States Code, Section 666(a)(1)(B);

(b) for YAN PO ZHU, also known as "Andy Zhu," and CRYSTAL CHEN to corruptly give, offer, or agree to give anything of value to FRANK V. CARONE and ANTHONY J. CARONE, with intent to influence or reward F. CARONE, being an agent of a local government, to wit: the City of New York, in connection with business and one or more

transactions and series of transactions of the City of New York involving things of value of $5,000 or more, while the City of New York was in receipt of, in any one year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance, contrary to Title 18, United States Code, Section 666(a)(2); and

(c) to use one or more facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of one or more unlawful activities, to wit: Bribery in the Third Degree, in violation of New York Penal Law Section 200.00; Bribe Receiving in the Third Degree, in violation of New York Penal Law Section 200.10; and Criminal Liability for Conduct of Another, in violation of New York Penal Law Section 20.00, and thereafter to perform acts to distribute the proceeds of such unlawful activity and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity, contrary to Title 18, United States Code, Section 1952(a)(3)(A).

50. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU, also known as "Andy Zhu," together with others, did commit and cause the commission of, among others, the following overt acts:

OVERT ACTS

a. On or about September 19, 2022, the defendant FRANK V. CARONE and the defendant YAN PO ZHU, also known as "Andy Zhu," exchanged text messages in furtherance of steering an Emergency Shelter Contract to the Microtel.

b. On or about September 26, 2022, the defendant YAN PO ZHU, also known as "Andy Zhu," sent a text message to the defendant FRANK V. CARONE soliciting assistance in obtaining an Emergency Shelter Contract for the Microtel.

c. On or about October 14, 2022, the defendant CRYSTAL CHEN transmitted via email to the defendant ANTHONY J. CARONE the signed Sham Retainer Agreement.

d. On or about October 14, 2022, the defendant CRYSTAL CHEN sent text messages to Individual #1 about the bribe payments to the defendants FRANK V. CARONE and ANTHONY J. CARONE.

e. On or about the following dates, the defendants YAN PO ZHU, also known as "Andy Zhu," and CRYSTAL CHEN caused the following bribe payments to be made to the Law Firm #2 Account:

| Approximate Date | Payor | Wire Amount |
|---|---|---|
| October 14, 2022 | Holding Company #1 | $10,000.00 |
| November 10, 2022 | Holding Company #1 | $10,000.00 |
| December 8, 2022 | Holding Company #1 | $10,000.00 |
| February 24, 2023 | Holding Company #2 | $20,000.00 |
| March 10, 2023 | Holding Company #1 | $10,000.00 |
| April 11, 2023 | Holding Company #2 | $20,000.00 |
| May 8, 2023 | Holding Company #1 | $10,000.00 |
| June 16, 2023 | Holding Company #1 | $10,000.00 |
| July 20, 2023 | Holding Company #1 | $10,000.00 |
| September 21, 2023 | Holding Company #1 | $10,000.00 |

f. On or about October 21, 2022, the defendant CRYSTAL CHEN sent text messages to Individual #1 about the bribe payments to the defendants FRANK V. CARONE and ANTHONY J. CARONE.

g. On or about November 10, 2022, the defendants YAN PO ZHU, also known as "Andy Zhu," and CRYSTAL CHEN made a bribe payment to the Law Firm #2 Account, after which the defendants FRANK V. CARONE and ANTHONY J. CARONE caused F. CARONE's personal assistant to electronically transfer funds from the Law Firm #2 Account to F. CARONE's personal credit card account.

h. On or about December 12, 2022, the defendants FRANK V. CARONE and ANTHONY J. CARONE caused F. CARONE's personal assistant to electronically transfer funds comprised in part of the proceeds of the bribe payments made by the defendants YAN PO ZHU, also known as "Andy Zhu," and CRYSTAL CHEN from the Law Firm #2 Account to F. CARONE's personal credit card account.

i. On or about April 12, 2023, the defendant ANTHONY J. CARONE wrote a check comprised in part of the proceeds of the bribe payments made by the defendants YAN PO ZHU, also known as "Andy Zhu," and CRYSTAL CHEN to Law Firm #1 which the defendant FRANK V. CARONE owned and controlled.

j. On or about December 25, 2023, the defendant FRANK V. CARONE and the defendant YAN PO ZHU, also known as "Andy Zhu," exchanged text messages in furtherance of the bribery scheme.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Federal Program Bribery)

51. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

52. In or about and between June 2022 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FRANK V. CARONE, being an agent of a local government, to wit: the City of New York, together with others, did knowingly, intentionally and corruptly solicit and demand for the benefit of F. CARONE and ANTHONY J. CARONE, and accept and agree to accept, one or more things of value, to wit: United States currency, from one or more persons, to wit: CRYSTAL CHEN and YAN PO ZHU, also known as "Andy Zhu," intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the City of New York involving things of value of $5,000 or more, while the City of New York was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance.

(Title 18, United States Code, Sections 666(a)(1)(B), 2 and 3551 et seq.)

COUNT THREE
(Federal Program Bribery)

53. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

54. In or about and between June 2022 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CRYSTAL CHEN and YAN PO ZHU, also known as "Andy Zhu," together with

others, did knowingly, intentionally and corruptly give, offer, and agree to give one or more things of value, to wit: United States currency, to one or more persons, to wit: ANTHONY J. CARONE and FRANK V. CARONE, with intent to influence or reward F. CARONE in his official capacity as an agent of the City of New York, in connection with business and one or more transactions and series of transactions of the City of New York involving things of value of $5,000 or more, while the City of New York was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance

(Title 18, United States Code, Sections 666(a)(2), 2 and 3551 et seq.)

COUNT FOUR
(Use of Interstate Facilities to Commit Bribery)

55. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

56. In or about and between June 2022 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU, also known as "Andy Zhu," together with others, did knowingly and intentionally use one or more facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of one or more unlawful activities, to wit: Bribery in the Third Degree, in violation of New York Penal Law Section 200.00; Bribe Receiving in the Third Degree, in violation of New York Penal Law Section 200.10; and Criminal Liability for Conduct of Another, in violation of New York Penal Law Section 20.00, and thereafter performed and attempted to perform acts to distribute the

proceeds of such unlawful activity and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3)(A), 2 and 3551 et seq.)

COUNT FIVE
(Conspiracy to Commit Honest Services Wire Fraud)

57. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

58. In or about and between June 2022 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU, also known as "Andy Zhu," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud and deprive the citizens of the City of New York and the government of the City of New York of their intangible right to the honest services of F. CARONE through bribery and kickbacks, to wit: one or more payments to F. CARONE, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNTS SIX THROUGH EIGHT
(Honest Services Wire Fraud)

59. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

60. On or about the dates set forth below, those dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY J.

CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU, also known as "Andy Zhu," together with others, did knowingly and intentionally devise a scheme and artifice to defraud and deprive the citizens of the City of New York and the government of the City of New York of their intangible right to the honest services of F. CARONE through bribery and kickbacks, to wit: one or more payments to F. CARONE, and for the purpose of executing such scheme and artifice, the defendants, together with others, transmitted and caused to be transmitted, by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds, as set forth below:

| Count | Approximate Date | Payor | Wire Amount |
|---|---|---|---|
| SIX | October 14, 2022 | Holding Company #1 | $10,000.00 |
| SEVEN | November 10, 2022 | Holding Company #1 | $10,000.00 |
| EIGHT | December 8, 2022 | Holding Company #1 | $10,000.00 |

(Title 18, United States Code, Sections 1343, 1346, 2 and 3551 et seq.)

COUNT NINE
(Money Laundering Conspiracy)

61. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

62. In or about and between June 2022 and December 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, and YAN PO ZHU, also known as "Andy Zhu," together with others, did knowingly and intentionally conspire to: (a) conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the electronic transfer and delivery of United States currency, which transactions in fact involved the proceeds of one or more specified unlawful activities, to wit:

(i) federal program bribery, as charged in Counts Two and Three, in violation of Title 18, United States Code, Section 666; (ii) use of interstate facilities to commit bribery, in violation of Title 18, United States Code, Section 1952, as charged in Count Four; and (iii) honest services wire fraud as charged in Counts Six through Eight, in violation of Title 18, United States Code, Sections 1343 and 1346, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity and knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and (b) engage in one or more monetary transactions, to wit: the electronic transfer and delivery of United States currency, in and affecting interstate commerce, by, through and to one or more financial institutions, in criminally derived property of a value greater than $10,000 and derived from one or more specified unlawful activities, to wit: (i) federal program bribery, as charged in Counts Two and Three, in violation of Title 18, United States Code, Section 666; (ii) use of interstate facilities to commit bribery, in violation of Title 18, United States Code, Section 1952, as charged in Count Four; and (iii) honest services wire fraud as charged in Counts Six through Eight, in violation of Title 18, United States Code, Sections 1343 and 1346, contrary to Title 18, United States Code, Section 1957(a) and 1957(b).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT TEN
(Obstruction of Justice)

63. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

64. In or about and between July 2024 and October 2025, within the Eastern District of New York and elsewhere, the defendants ANTHONY J. CARONE and FRANK V. CARONE, together with others, did knowingly, intentionally and corruptly obstruct, influence, and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.

(Title 18, United States Code, Sections 1512(c)(2), 2 and 3551 et seq.)

COUNT ELEVEN
(Subscribing to a False Tax Return)

65. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

66. On or about March 14, 2023, within the Eastern District of New York and elsewhere, the defendant ANTHONY J. CARONE did knowingly and willfully make and subscribe a false and fraudulent U.S. Individual Income Tax Returns, Form 1040, for the tax year 2022, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the IRS, which tax return A. CARONE did not believe to be true and correct as to one or more material matters, in that A. CARONE falsely underreported his total income, whereas A. CARONE then and there well knew that his total income was greater than the reported amount.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT TWELVE
(Subscribing to a False Tax Return)

67. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

68. On or about March 14, 2023, within the Eastern District of New York and

elsewhere, the defendant ANTHONY J. CARONE did knowingly and willfully make and subscribe a false and fraudulent U.S. Return of Partnership Income Tax Returns, Form 1065, for Law Firm # 2 for the tax year 2022, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the IRS, which tax return A. CARONE did not believe to be true and correct as to one or more material matters, in that A. CARONE falsely underreported Law Firm #2's gross receipts and ordinary income, whereas A. CARONE then and there well knew and believed that Law Firm #2's gross receipts and ordinary income were greater than the reported amounts.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT THIRTEEN
(Subscribing to a False Tax Return)

69. The allegations contained in paragraphs one through 47 are realleged and incorporated as if fully set forth in this paragraph.

70. On or about October 16, 2023, within the Eastern District of New York and elsewhere, the defendant FRANK V. CARONE did knowingly and willfully make and subscribe a false and fraudulent U.S. Individual Income Tax Returns, Form 1040, for the tax year 2022, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the IRS, which tax return F. CARONE did not believe to be true and correct as to one or more material matters, in that F. CARONE falsely underreported his total income, whereas F. CARONE then and there well knew that his total income was greater than the reported amount.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH EIGHT AND TEN

71. The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One through Eight and Ten, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

72. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT NINE

73. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Nine, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

74. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

[redacted]

FOREPERSON

[redacted]

MICHAEL G. CONSIDINE
FIRST ASSISTANT UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

AO 93C (08/18) SDNY Rev. Warrant by Telephone or Other Reliable Electronic Means ❒ Original ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Frank Carone and His Devices

Case No. **26 MAG 2484**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Southern District of New York *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A-1

The search and seizure are related to violation(s) of *(insert statutory citations)*:

Title 18, United States Code, Sections 371 (conspiracy); 666 (government program fraud); 1952 (use of interstate facilities to commit bribery); 1346 (honest-services wire fraud); 1349 (wire fraud conspiracy); 1951 (extortion under color of official right); 1956 (money laundering); 1512(c) (obstruction of justice); and 1519 (falsification of records in connection with federal investigation) and Title 26, United States Code, Section 7206

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment A-1

**YOU ARE COMMANDED** to execute this warrant on or before July 7, 2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to USMJ on duty.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ______________.

Date and time issued: June 23, 2026 at 5:50 pm

[redacted]
*Judge's signature*

City and state: New York, New York

The Honorable Ona T. Wang, U.S.M.J.
*Printed name and title*

**EDNY-FC_0000000117**

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

# ATTACHMENT A-1

## I. Person to Be Searched – Subject Person

The person to be searched is Frank Carone, who is particularly described as a Caucasian male, with a birth is [redacted] and social security number is [redacted], and who is approximately 5'6 tall and weighs approximately 180 lbs, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant. The following photograph depicts the Subject Person.



## II. Items to be Seized

### A. The Subject Devices

Law enforcement personnel are authorized to seize any and all cellphones, laptop computers, tablets, or other electronic devices found in the possession, custody, or control of the Subject Person, including a cellular telephone assigned call number [redacted] (collectively, the "Subject Devices"), on the condition that the Subject Person is located in the Southern District of New York at the time of the execution of the warrant.

### B. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Person consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371 (conspiracy); 666 (government program fraud); 1952 (use of interstate facilities to commit bribery); 1346 (honest-services wire fraud); 1349 (wire fraud conspiracy); 1951 (extortion under color of official right); 1956 (money laundering); 1512(c) (obstruction of justice); and 1519 (falsification of records in connection with federal investigation) and Title 50, United States Code, Section 7206 (the "Subject Offenses") involving the Subject Person and others, known and unknown, between (a) January 1, 2022 and December 31, 2023, (b) June 1, 2024 and November 31, 2024; and (c) April 1, 2025 and the Present, described as follows:

1. Any items or records needed to access the data stored on any seized or copied cellphone, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the electronic devices, including any hardware or software manuals or other information concerning the configuration of the seized or copied electronic devices.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied electronic devices.

4. Written passwords, login credentials, notes, or other documentation related to online accounts, social media platforms, or access to electronic devices.

5. Printed photographs, images, or documents containing depictions of minors or related to the Subject Offenses.

**III. Data to be Seized**

The data to be seized from the Subject Devices consist of the following evidence, fruits and instrumentalities of violations of the Subject Offenses:

1. Records, information, communications and documents relating to or constituting evidence that the Subject Person or any person at the direction of, or in concert with, the Subject Person received one or more thing(s) of value from or one or more persons seeking to do business with the City of New York (including, but not limited to, any contracts awarded or funds obtained by the Sapphire Hotel LLC, d/b/a "Microtel LIC"),

2. Records, information, communications and documents relating to or constituting evidence that the Subject Person attempted to obstruct a federal investigation;

3. Calendar entries, contacts, telephone call logs, images, bookmarks, photos, audio and/or video recordings, text messages, notes, and web browsing history associated with the above-referenced conduct in (a) and (b);

4. Evidence indicating how and when the Subject Devices were accessed or used, to determine the chronological and geographic context of access, use and events relating to the crimes under investigation and the account subscriber;

5. Evidence and information related to communications about the Subject Offenses;

6. Evidence and information related to in-person, virtual, or telephonic meetings involving one or more coconspirators, including individuals whose identities are not yet known, including audio or video recordings of such meetings or calls, notes and summaries of such meetings or calls, and communications reflecting or referring to in-person meetings and telephone calls;

7. Information related to the physical location of the Subject Person and any other coconspirators, individuals whose identities are not yet known, including Global

Positioning System location data, Internet Protocol address information, photographs, videos, audio recordings, and communications;

8. Financial records, including all bank records, checks, credit card bills, and account information related to the crimes listed in this warrant;

9. Photographs, videos, and/or audio recordings, including voicemails, of or related to the Subject Person and/or other coconspirators, including individuals whose identities are not yet known, related to the Subject Offenses;

10. Information related to evidence indicating how and when electronic communications accounts (e.g., cellular devices, email accounts, social media accounts, and other messaging platforms, including Signal) were accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the account subscribers;

11. Evidence indicating the state of mind of the Subject Person and/or other coconspirators, as it relates to the crimes under investigation;

12. Information related to evidence of aiding and abetting and conspiring to commit the Subject Offenses; and

13. Any evidence regarding concealment of the above-outlined schemes.

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## IV. Unlocking Devices with Biometric Features

During the execution of the warrant, law enforcement personnel are authorized to obtain from the Subject Person the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock a Subject Device, including to (1) press or swipe the fingers (including thumbs) of the Subject Person to the fingerprint scanner of the Subject Device(s); (2) hold the Subject Device(s) in front of the face of the Subject Person to activate the facial recognition feature; and/or (3) hold the Subject Device(s) in front of the face

of the Subject Person to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.