UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ---------------------------------------------------- | X: |
| UNITED STATES OF AMERICA, | : NO. 1:26-CR-00177 (KAM) |
| V. | : |
| ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, AND YAN PO ZHU, | : |
| DEFENDANTS. | : |
| ---------------------------------------------------- | : X |

**AFFIDAVIT OF ANDREW TAPPETO**

I, Andrew Tappeto, hereby declare as follows:

1. I am an Associate Managing Director at Nardello & Co. LLC ("Nardello"), a global investigations firm. As a member of the Digital Investigations & Cyber Risk practice group, I am responsible for supporting our clients' digital investigations needs, including in the context of criminal and civil litigation matters.

2. I submit this affidavit based on my personal knowledge and experience, and my investigation of the facts herein. If called as a witness, I could and would testify competently to them.

3. I have eight years of experience working in the digital forensics field. I have conducted collections and reviewed thousands of digital data sources, including mobile devices, computers, email accounts and cloud services. I am an active member of the digital forensics community and hold industry-recognized certifications (Certified Forensic Computer Examiner, Cellebrite Mobile Forensic Fundamentals) and have provided expert testimony in federal court.

4. I understand that the government obtained two search warrants during its investigation of Frank Carone: a December 2024 warrant for the contents of Frank Carone's iCloud

account (the "iCloud Warrant"), and a June 2026 warrant for Frank Carone's personal and physical devices (the "Phone Warrant").

5. I received a copy of the data returned in response to the warrant for Frank Carone's Apple iCloud account from Cooley LLP. The data contained native documents and multiple Cellebrite Physical Analyzer UFDRs (Universal Forensic Extraction Device Reports) which were created between April 1-3, 2025. I was also given access to American Express records, Apple records, AT&T records, Charter Communications records, Cogent Communications records, Comcast records, Flagstar Bank records, Google Records, Optimum records, T-Mobile records, Verizon records, and records obtained from an Apple iCloud account associated with Yan Po Zhu, all produced by the government. At the direction of Cooley LLP, I reviewed and analyzed the materials contained within the identified record sets.

**IP Address Analysis**

6. An IP address is an identifier for an internet connection. IP addresses are commonly recorded by online services which identify the network from which activity originated. Additionally, IP addresses may appear in logs documenting access to accounts or websites. Multiple users, devices, or accounts may utilize the same public IP address through a shared residence, office, wireless network, or other shared internet connection. An IP address can be used to identify the network connection from which activity originated at a particular point in time.

7. In the iCloud Warrant affidavit, Special Agent Cunder represented that based on his review of Apple records with information pertaining to the IP addresses that were used to access Frank Carone's iCloud account, six IP addresses, "among others," were used to access the Carone & Associates bank account at Flagstar (the "Flagstar Account") in 2022: 38.140.163.118, 67.247.104.223, 50.74.255.170, 75.99.33.206, 2603:7000:2701:90eb:48d9:f6ef:3708:c192, and

2603:7000:2701:90eb:35bd:cda9:b820:f453.[1] iCloud Aff. ¶ 31. Based on my review of the documents, these Apple records include information about IP addresses that ***do not appear to have been associated with*** Frank Carone's iCloud account; only three of the six IP addresses identified from the Apple records and listed in paragraph 31 appear to have ever been associated with Frank Carone's iCloud account.

8. A separate paragraph of the iCloud Warrant affidavit appears to acknowledge as much. Specifically, the iCloud Warrant affidavit went on to state that based on Special Agent Cunder's review of the Flagstar Account records, he identified "***three*** IP addresses [that] were also used to access [Frank's iCloud account]" (emphasis added) : 38.140.163.118, 67.247.104.223, and 50.74.255.170. He stated that 38.140.163.118 was used to access Frank's iCloud account 42 times; 67.247.104.223 was used to access Frank's iCloud account 440 times; and 50.74.255.170 was used to access Frank's iCloud account 403 times. iCloud Aff. ¶ 32. Together, he stated that these three IP addresses were used to access Frank's iCloud account approximately 885 times. *Id.* Special Agent Cunder represented that these three IP addresses were also used to access the Flagstar Account on numerous occasions, based on Flagstar banking records. *Id.*

9. Based on my review of the iCloud Warrant affidavit, Special Agent Cunder relied on the overlap of these three IP addresses in both the Apple records and the Flagstar records to support his conclusion that Frank Carone controlled both accounts, and effectuated transfers of third-party funds from the Flagstar Account for his benefit. iCloud Aff. ¶¶ 33–34. Based on a careful review of these records, and as set forth below, I believe that these statements are not supportable by the available evidence.

---

[1] Special Agent Cunder stated that "seven unique IP addresses (among others) were used to access the Carone Assoc. Account," but lists only these six IP addresses.

10. Based on my background and experience, I know that IP address locations are generally publicly available via record searches. I conducted a review of the locations of the three overlapping IP addresses cited in the iCloud affidavit, using publicly available information. I also reviewed various subscriber records produced by the government and provided to me by counsel which can indicate where an IP address is located, and which persons or entities are associated with the IP address.

11. Based on my review of the produced documents and record search results, my conclusions relating to the locations of three IP addresses that overlap between Frank Carone's iCloud Account and the Flagstar Account are as follows:

| **IP Address** | **Location** |
|---|---|
| 38.140.163.118 | Coordinates 40.6505, -73.9496, registered to Abrams Fensterman's Brooklyn, New York office |
| 50.74.255.170 | Coordinates 40.6505, -73.9496, registered to Abrams Fensterman's Brooklyn, New York office |
| 67.247.104.223 | Coordinates 40.7132, -74.0061 at or near City Hall |

12. I have reviewed the Apple and Flagstar records described in the iCloud affidavit. The Apple records appear to reflect, for all Apple IDs covered by the production: (1) account sign-ons, (2) the Apple ID and IP address from which the activity originated, and (3) other account-related activity, including software updates, transactions, and iCloud events. Based on my review, the Apple records include Frank Carone's records as well as the records of approximately 22 other individuals, including Anthony Carone. The records show the date and time of each event, the type of activity performed, the Apple ID (or associated person) to which the activity is attributed, and the IP address from which the activity originated. Based on my review, it appears that the Flagstar records log various account-related functions or activity performed by users; however,

none of the records show Frank Carone as a user. The Flagstar records show the credentials (user name and user ID) used to access the account, the IP address used to complete the function, and the date the function was executed.

13. The Apple records reflect a total of 21,707 instances of account activity associated with Frank Carone's iCloud Account across 1,432 IP addresses. Of those, as Special Agent Cunder represented in the iCloud Warrant affidavit, only 885 instances involve the three IP addresses the government attributes to Frank Carone: 38.140.163.118 (42 instances), 67.247.104.223 (440 instances), and 50.74.255.170 (403 instances). The remaining 20,822 instances involve 1,429 other IP addresses.

14. The fact that Frank Carone's iCloud Account has hit on these three IP addresses – without accounting for the relevant time frames – is not informative. My review of the Apple records indicates that the relevant overlap generally tracks Mr. Carone's employment history rather than the scheme alleged in the affidavit. Specifically, IP address 38.140.163.118, which I understand was associated with Abrams Fensterman, was never used to access Frank Carone's iCloud Account during 2022 or 2023, the time period of the alleged scheme. IP address 50.74.255.170, which I also understand was associated with Abrams Fensterman, reflects activity concentrated in the years before (and to a lesser degree after), but only 11 instances in 2022. By contrast, use of IP address 67.247.104.223, the location at or near City Hall, is concentrated almost entirely within 2022. In other words, Frank Carone's usage of the two Abrams Fensterman addresses is concentrated outside of the 2022 period in which the government alleges the scheme took place, while his usage of the City Hall address is concentrated almost entirely within that same 2022 period. I understand from my conversations with counsel that Frank Carone worked at Abrams Fensterman from approximately 2011 until on or approximately December 31, 2021, and

as the Chief of Staff to the Mayor from approximately January 1, 2022 to December 21, 2022. He resumed an affiliation with Abrams Fensterman beginning in 2023.

15. It also bears noting that the Flagstar records *do not include* any IP address data before November 2022; thus, although he did not disclose as much in the iCloud Warrant affidavit, Special Agent Cunder could not have used more than two months' worth of data for 2022 to come to the conclusion that Frank Carone was controlling the Flagstar Account during a key time frame referenced in his affidavit.

16. Nonetheless, I have compared the IP addresses linked to Frank Carone's iCloud Account to the time period during which those same IP addresses accessed the Flagstar Account. I have also performed the same comparison with respect to *Anthony* Carone's iCloud account and the Flagstar Account. Those comparisons make clear that there is minimal overlap between Frank Carone's iCloud IP address data and the Flagstar IP address data for the key time frames, and substantial overlap between Anthony Carone's iCloud IP data and the Flagstar IP data for those same time frames.

17. Specifically, my comparison yielded the following findings:

a. The three relevant IP addresses hit on the Flagstar Account a total of 75 times during the available period of data in 2022: 67 times from one of the two Abrams Fensterman IP addresses, four times from the second Abrams Fensterman IP address, and four times from the City Hall IP address. In other words, over 94 percent of the relevant access came from Abrams Fensterman.

b. Anthony Carone made use of the Abrams Fensterman IP addresses far more substantially than Frank Carone in 2022. This is consistent with the fact that, as I have been

informed by counsel, Anthony Carone began working at Abrams Fensterman in 2022, after Frank Carone went to work for Mayor Adams.

c. Specifically, Anthony Carone's iCloud connected to the Abrams Fensterman IP addresses 325 times in 2022, whereas Frank Carone's iCloud connected to the Abrams Fensterman IP addresses 11 times in 2022, a thirty-fold difference. To the extent that the overlap between an iCloud IP address and a Flagstar IP address is relevant to the question who controlled the Flagstar Account—particularly given that over 94 percent of the relevant overlap relates to Abrams Fensterman IP addresses—it appears overwhelmingly more likely that Anthony Carone (the owner of the law firm affiliated with the Flagstar Account) controlled that account, and not Frank Carone.

18. While the Indictment references allegedly criminal transfers during calendar year 2023, the available data from that year similarly does not support the inference that Frank Carone, as opposed to Anthony Carone or another person, controlled the Flagstar Account. From 2023 forward, the Flagstar records reflect that the Flagstar Account was accessed 542 times from the Abrams Fensterman IP addresses. In 2023, Frank Carone's iCloud account hit on the Abrams Fensterman IP addresses 83 times, whereas Anthony Carone's iCloud hit on the Abrams Fensterman IP addresses 457 times. As I have been informed by counsel, both Carones were affiliated with Abrams Fensterman in 2023.

19. By ignoring the timing of the IP address hits, Special Agent Cunder drew an inaccurate conclusion about whether Frank Carone controlled the Flagstar Account. Specifically, of the 885 relevant Frank Carone iCloud hits that Special Cunder referenced:

a. Special Agent Cunder attributes 42 hits across Frank's iCloud records from the IP address 38.140.163.118 (affiliated with Abrams Fensterman, as noted above). Each of those 42 hits falls between the years 2017 to 2019—years before the pay-to-play scheme alleged in the

affidavit began. Rather, this usage would be consistent with Frank Carone's employment at Abrams Fensterman during this period before he worked in City Hall. And, as noted above, there appears to be no available Flagstar Account IP address data from that time period against which to make a comparison.

b. Special Agent Cunder attributes 440 hits across Frank's iCloud records from the IP address 67.247.104.223 (affiliated with City Hall, as noted above). All but one of those (439 of 440) fall between January 26, 2022 and December 24, 2022—the period during which Frank Carone was serving as Mayor Adams's Chief of Staff. This usage would be consistent with Frank Carone working out of City Hall during that period. Although IP addresses associated with Frank Carone frequently hit in the vicinity of City Hall during the year 2022, the Flagstar Account was only accessed via that same IP address on two instances the same year.[2] This could well be consistent with Anthony Carone or another user of the Flagstar Account being in the same vicinity on two occasions.

c. Special Agent Cunder attributes 403 hits across Frank's iCloud records from the IP address 50.74.255.170 (affiliated with Abrams Fensterman, as noted above). Among the 403 hits identified, only 11 of those 403 hits occurred in 2022; the overwhelming majority—including 152 hits in 2019, 83 hits in 2023, and additional hits in 2017, 2018, 2020, and 2021—fall outside the year the alleged scheme took place. This usage would be consistent with Frank Carone's employment at Abrams Fensterman.

20. Special Agent Cunder went on to state that American Express records reveal that, on each date a transfer was made from the Flagstar Account to Frank Carone's American Express account, the American Express web portal was accessed through IP address 38.140.163.118. This

[2] Each of those two occasions is reflected as two line items in the underlying Flagstar records.

fact is consistent with the transfers being made from Abrams Fensterman. I have not reviewed any records indicating that Frank's iCloud accessed that IP address at all in 2022 or 2023. Rather, Apple records show that Anthony Carone's iCloud was associated with that address 158 times in 2022.[3] Further, as explained above, the Flagstar Account records contain no logged activity of any kind for IP address 38.140.163.118—or any other IP address—before November 9, 2022. To the extent any of the transfer dates Special Agent Cunder relies upon predate November 9, 2022, there would be no Flagstar-side records from that IP address, or any IP address, against which the American Express portal access could have been compared at all.

**iCloud and iMessage Collection and Analysis**

21. There are two distinct repositories where data is stored within an Apple account. The first is the synced data repository, which houses data that is synced to iCloud. When the "Messages in iCloud" feature is enabled on a user's phone, messages on the phone sync to the user's iCloud and are stored in the synced data repository.

22. The second repository is the iCloud backup, which is a device-level backup of certain data categories, including messages. Apple generally stores only the most recent iCloud backups (two to three backups); as new backups are created, the older backups are overwritten.

23. The Apple records produced to the government that I reviewed contain both "Messages in iCloud" data and iCloud backup data, meaning that the Apple records contain the

[3] It bears noting that the Apple records show that Frank Carone's assistant Jennifer Nicoletta's Apple account was also frequently accessed from the same two IP addresses associated with the Abrams Fensterman offices, including in 2022. Based on my discussions with counsel, I understand this to be consistent with the fact she was working at Abrams Fensterman during this time, and that she assisted Anthony Carone in facilitating the American Express transfers via the American Express portal (and *not* via the Flagstar Account).

full universe of messages associated with Frank Carone's iCloud account at the time that Apple produced the records.

24. I have reviewed Frank Carone's iCloud message collection as produced by the government (EDNY_0000051157 and the UDFR reports in EDNY-FC_0000000142). Based on my review, the earliest message in Frank's iCloud is from November 13, 2023, with the exception of a single, unidentifiable placeholder message sent on July 22, 2022 . This placeholder message is recorded as an "obj," which in my experience may indicate content that was not rendered or interpreted by the device at the time that data was produced, and is not likely to contain any substance.

25. Based on my experience, the absence of any real message data before November 13, 2023 indicates that (1) it is highly likely Frank Carone did not enable the "Messages in iCloud" feature on his phone prior to that date, and (2) either Frank Carone's phone was not backed up during the relevant time period, or Apple no longer maintained any available backup covering the relevant time period at the time Apple produced the records because those older backups had been overwritten by newer backups.

26. Based on my experience, the information reflected in the Apple records is inconsistent with manual deletions of messages prior to November 13, 2023.

27. I have also reviewed an export of Andy Zhu's Apple iCloud backup containing messages relevant to this case (produced by the government as EDNY_0000023001). There are 472 message artifacts between Mr. Zhu and Frank Carone, spanning from February 23, 2022 to November 28, 2024. The vast majority of those messages (402 of them) are from the time period prior to November 13, 2023, when it appears that Frank Carone was not syncing his messages to

iCloud through the "Messages in iCloud feature," and for which no backup of Frank Carone's phone exists in the Apple records.

28. As reflected in Mr. Zhu's iCloud records, there are 70 message artifacts between Frank Carone and Mr. Zhu spanning from November 13, 2023 to November 28, 2024, the only period for which message data exists in both Mr. Zhu's iCloud records and Frank Carone's iCloud records. Frank Carone's iCloud contains 37 of those 70 messages (in other words, 33 messages from that time period are present in Mr. Zhu's iCloud but absent from Frank Carone's).

29. Of the 33 messages present in Mr. Zhu's iCloud records but absent from Frank Carone's, the content is largely mundane: holiday greetings, meeting logistics, one-word replies, and unrelated news links. The missing content consists of entire sets of message exchanges over nine specific days, the overwhelming majority of which is mundane.

30. In the set of 33 messages is an exchange from December 25, 2023, which includes language quoted in Paragraph 46 of the Indictment (Frank Carone says he is "not happy about something," and is "not discussing anything until past is worked out," and Mr. Zhu responds, "I asked my partners to pay you for a year"). The December 25, 2023 message exchange is missing as a complete, undifferentiated block: in addition to the three messages noted above, all other messages from that date are also missing.

31. The November 21, 2023 message from Frank Carone to Mr. Zhu quoted in Paragraph 45 of the Indictment ("I need to see you") is *not* missing from Frank Carone's iCloud.

32. The remaining messages missing from Frank Carone's iCloud in the same post-November 13, 2023 time period are non-substantive well-wishes, or messages coordinating logistics or discussing unrelated matters and appear to be arbitrarily missing—each of them in the

context of innocuous messages. For example, the following messages between Frank Carone and Mr. Zhu from the same time period are missing from Frank Carone's iCloud:

- A January 3, 2024 message from Frank Carone saying "Happy new year my friend";
- A January 5, 2024 message from Mr. Zhu saying "please text me your daughter's engagement party invite";
- A January 18, 2024 message from Mr. Zhu saying "Please call me when you free." While this January 18 message is missing from Frank Carone's iCloud, a January 24, 2024 message from Mr. Zhu saying substantially the same thing ("Hi brother. Call me when you free please") is *not* missing.
- Messages sent from February 23 to 27, 2024 coordinating a meeting in the city. While those messages are missing from Frank Carone's iCloud, a January 4, 2024 message from Mr. Zhu coordinating a meeting with Frank Carone ("Hi brother Where are we meet later.") is *not* missing.
- A March 5, 2024 message from Mr. Zhu saying "How much is the asking price." While this March 5 message is missing from Frank Carone's iCloud, a March 8, 2024 message from Mr. Zhu asking the same question ("Is this for sale? If yes, what's the asking price") is *not* missing.

33. Thus, the messages missing from Frank Carone's iCloud do not fit a consistent pattern one would expect to see with deliberate concealment; rather, they appear made at random.

34. Based on my professional experience and knowledge, messages stored in iCloud are not directly accessible. Access to iCloud occurs through a device that has the "Messages in iCloud" feature enabled. For example, if an iPhone has the Messages in iCloud feature enabled,

messages stored in iCloud are accessible through that iPhone. If a second device associated with the same Apple ID also has the Messages in iCloud feature enabled, the messages will synchronize from iCloud to both devices. Because messages stored in iCloud cannot be directly viewed through a web interface (*e.g.*, iCloud.com), the physical devices associated with the account are the only mechanism through which those messages are accessed.

35. A message cannot first be deleted in iCloud, because there is no way to access messages in the cloud. If a user wants to delete a message, the user must do so from a device that has Messages in iCloud enabled and a device that is connected to the same Apple account, such as an iPhone. A message may be deleted from a physical device, which then causes the message to be removed from iCloud and any other synchronized devices. The one exception arises when a message is deleted from one physical device while another device synced to the same iCloud account is offline: the deletion occurs on, and syncs from, the first device, removing the message from iCloud, but because the second device is not connected to the internet, it does not sync with iCloud and the message may still exist on that device.

36. If the "Messages in iCloud" feature is disabled, then messages can be backed up to iCloud via the iCloud backups mechanism discussed above, *supra* ¶ 22. If a message is deleted from a device, the deletion will reflect in an iCloud backup taken after the deletion occurred. That deleted message will still exist in an iCloud backup that was taken prior to the deletion occurring. Thus, it is possible for a message to be deleted from a physical phone but still exist in an iCloud backup. However, for the reasons described above, with the exception of the second-device example, messages cannot be deleted from iCloud while still existing on a physical phone. Additionally, messages can be missing from a phone but appear on an iCloud backup, but that would not be as a result of deletion directly from iCloud.

37. Based on my review of the available Apple records and my experience, contrary to Special Agent Cunder's statements, I did not identify evidence that messages allegedly missing from Frank Carone's iCloud account could be recovered from his physical device. I also did not identify evidence in the produced records suggesting that this account fell within a circumstance where messages would appear on a physical device but not in the associated iCloud data.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed by me on October 2, 2026, in the City of Nassau.

By: ______________________________
Andrew Tappeto
Nardello & Co. LLC